DANIEL R. MAGRUDER *vs.* THOMAS SWANN, GOVERNOR OF MARYLAND.

CONTESTED ELECTIONS:—The "contested elections" spoken of in ART. 4, SEC. 15, OF THE CONSTITUTION OF 1864, mean, as appears from the context, contests between candidates at such election, not any dispute about the office of Judge, in which one party claims by appointment by the executive and the other by election of the people.

The power given to the House of Delegates in such cases is, to "judge of the election and qualifications of the candidates." They have no power to judge of the rights of persons who were not candidates, and claim under some other authority, denying, perhaps, the regularity of the election or the right of the people to fill the supposed vacancy.

DISQUALIFICATION OF JUDGE, WHERE THE TITLE TO HIS OFFICE IS IN QUESTION.—The provisions of the Constitution of 1864, for the trial of causes in case of the disqualification of the incumbent (Art. 4, secs. 7 and 8,) not only apply to cases where the judge is affected in person or property, but also to those involving his right to his office.

JUDGE WHEN SUED TO CERTIFY HIS INCAPACITY TO ACT.—The Court is open to all suitors, even against the judge himself; his authority extends to all cases in which he is not disqualified by interest, relationship to the parties, or has formed professional connection with the cause; when these occur, his power as judge ceases, except to certify his incapacity to act.

No disqualification of a judge can be so obvious and absolute as that which involves the question of his title to the office he holds. When that is questioned, he comes immediately within the letter and spirit of the 7th section of Art. 4, above cited, and no alternative is left but to certify his disqualification.

CONSTITUTION OF 1864, ART. 4, SECS. 14, 15 AND 16, DEVOLVE UPON THE GOVERNOR AUXILIARY, AND MINISTERIAL DUTIES: CLERKS' CERTIFICATES PRIMA FACIE EVIDENCE OF ELECTION: ISSUING OF COMMISSIONS AND GRANTS ANALOGOUS DUTIES: INDEPENDENCE OF THE EXECUTIVE AND JUDICIAL DEPARTMENTS IN THEIR RESPECTIVE SPHERES: MANDAMUS WILL LIE AGAINST THE GOVERNOR OF THE STATE FOR NONPERFORMANCE OF MINISTERIAL DUTIES.—Art. 4, sec. 14, of the Constitution of 1864, after providing for the election of judges, requires "all elections of judges and other officers provided for by this Constitution—States Attorneys' excepted—shall be certified, and the returns made by the clerks of the respective counties to the Governor, who shall issue commissions to the different persons for the offices to which they shall

have been respectively elected; and in all such elections, the person having the greatest number of votes shall be declared to be elected." Sec 15 of the same Article, declares: "if, in any case of election for Judges, Clerks of the Courts of Law and Registers of Wills, the opposing candidates shall have an equal number of votes, it shall be the duty of the Governor to order a new election; and in case of any contested election, the Governor shall send the returns to the House of Delegates, who shall judge of the election and qualification of the candidates at such election." Section 16, further provides, that all public commissions and grants shall run thus: "The State of Maryland," &c., "and shall be signed by the Governor with the seal of the State annexed," &c.—HELD:

1st. That the duties devolved upon the Governor by these sections of Art. 4, are auxiliary ministerial duties to be performed as preliminary to the qualifications of the judges and other officers, in the discharge of which he has no discretion, but is imperatively required by the organic law to perform, in order to keep the departments of government in motion.

2nd. That the clerks' certificates determine who has the greatest number of votes, "or whether the opposing candidates have an equal number of votes." In either event, the injunction of the Constitution is equally peremptory.

3rd. That all public commissions and grants are included in the same section as analagous in their nature. The Governor acts alike in both instances, as the custodian of the great seal of the State, to be annexed to his sign manual.

4th. It is not necessary that the Governor should be satisfied in all instances of the regularity of the returns of the clerks; ordinarily he has no control over them, but acts upon the *prima facie* result. If they are irregular, the parties interested have their remedy by contesting the election before the appropriate tribunal.

5th. The commission, like a patent, is primary proof of the title of the officer or patentee, but the Courts may inquire whether the one or the other was properly issued. In many cases the commission is a necessary prerequisite to the right of qualification to office.

6th. Each of the co-ordinate departments of the government is independent of the other, in the sphere of its action, and has duties to perform in which it is not subject to the control of the other; but this independence does not proceed from the grade of the office so much as the nature of the act to be performed.

7th. The Governor, in his political and executive duties, requiring the exercise of his judgment and discretion, is entirely independent of any other authority. But all judicial power is as absolutely committed to

the Judiciary Department, as political or executive power is to the Governor; and among these judicial duties is the decision of controversies between man and man, whether they involve the right of office, life, liberty or property, or arise under the provisions of the Constitution, statute or common law.

8th. Although it was said in the case of *Miles vs. Bradford,* 24 *Md. Rep.,* that "the Governor bears the same relation to the State that the President does to the United States, and in the discharge of his political duties, is entitled to the same immunities, privileges and exemptions,"—it is nowhere said, that the President or Governor, in the discharge of mere ministerial duties, would be exempt from judicial process.

9th. That the Governor of the State, like all other officers in the discharge of mere ministerial duties, is subject to the writ of *mandamus,* which cannot be denied to a suitor in such case, without acknowledging an authority higher than the law.

TENURE OF OFFICE OF CIRCUIT JUDGE: ART. 4, SEC. 27, OF THE CONSTITUTION OF 1864, however interpreted, whether as speaking at the time the instrument was framed, or at the time it became effective, has a special, exclusive sense which cannot be misunderstood. No latitude of construction can justify the reading of "elected" as the synonym of "appointed."

CONSTITUTION OF 1864, ART. 12, SEC. 6, OF SCHEDULE.—The office of that clause of the Constitution, embraced in Art. 12, sec. 6, of the schedule, is intended to preserve the machinery of government in the change from one Constitution to another; its operation is not to suspend the authority of the new Constitution, but to preserve or continue the corps of officers holding under the old or former government, until their successors or themselves are appointed under the new.

————: ART. 2, SECS. 13 AND 14, AND ART. 4, SEC. 5, OF THE CONSTITUTION OF 1864, correspond, with a single exception, with Art. 2, secs. 11 and 12, and Art. 4, sec. 25, of the Constitution of 1851 : under their provisions, as interpreted by the Court of Appeals, an actual vacancy having occurred in the office of Judge by death, it was competent for the Governor to fill the same by issuing a temporary commission, which continued in force to the end of the next session of the General Assembly or till some other person is appointed to the same.

————: Art. 4, sec. 5, Constitution of 1864. A temporary commission having been issued under the Articles and sections of the Constitution of 1864, last referred to, the tenure of office thereunder was, by sec. 6, of the schedule continued through the interval between the appointment and the meeting of the General Assembly of 1865; the Governor, then, by and

with the advice and consent of the Senate, appointed the incumbent to fill the vacancy (which had occurred in the recess of the Senate).—HELD:

That holding under this appointment the incumbent was not entitled to the office for and during the term for which his predecessor was elected, his title thereto being derived under Art. 4, sec. 5, of the Constitution of 1864, which expressly limits the holding to the period of "the next general election thereafter, whether for members of the General Assembly or county officers, which shall first occur."

APPEAL from the Circuit Court for Anne Arundel county:

Petition filed by the appellant on the 13th of January, 1866, praying for an order requiring the appellee, Thomas Swann, Governor of Maryland, to show cause why a writ of *mandamus* should not issue, commanding him, as Governor aforesaid, to issue a commission to the petitioner, as Circuit Judge of the Second Judicial Circuit of the State of Maryland. The material allegations of the petition and answer are stated in the opinion of this Court.

This appeal is from an order of the Court below, (R. JOHNSON, Jr., Special Judge,) dismissing the petition of the appellant.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH and COCHRAN, J., the counsel for the appellant and appellee, including in their arguments the additional point raised in the succeeding case of *Magruder vs. Tuck*, in which were also involved all the questions raised in this cause.

*Thos. S. Alexander and Alexander B. Hagner*, for the appellant:

This Court is now called to determine the question arising under these appeals; whether the Circuit Courts of this State possess the power to award a writ of *mandamus* against the Governor of the State, directing him to perform a *ministerial act*, devolved upon him by the constitution or

Magruder *vs.* Swann, Governor.

laws? The point has never been decided by the Courts of highest resort in Maryland, for the decision in the case of *Miles vs. Bradford*, 22 *Md. Rep.*, 170, as we submit, expressly turns upon the consideration that the duty which the new constitution devolved upon the Governor, in reference to the examination and declaration of the popular vote on that instrument, was both political and judicial.

I. Sec. 14, of Art. 4, of the Constitution entitled, " Judiciary Department," declares, "all elections of Judges and other officers provided by this Constitution, State's attorneys excepted, shall be certified, and the returns made by the clerks of the respective counties to the Governor, who shall issue commissions to the different persons for the offices to which they have been respectively elected; and in all such elections, the person having the greatest number of votes shall be declared to be elected." Sec. 16 of the same Article, says, "all public commissions and grants shall run thus: 'The State of Maryland,' &c., and shall be signed by the Governor, with the seal of the State annexed," &c. We insist, that these provisions impose upon the Governor the performance of a mere ministerial duty, in no degree affecting the political powers of the Executive, or involving the exercise of discretion on his part, in the legal signification of that term; and that the Courts of this State are clothed with the power to direct by *mandamus* the performance by the Governor of such duty, on the petition of a citizen whose rights are violated by its non-performance, and who has no other specific, legal and civil remedy. *Evans' Prac.*, 407.

That the duty is merely a ministerial one, seems clear. The constitution might have directed any other officer to issue commissions to officers, and the selection of the Governor for the purpose was merely a matter of greater convenience. The injunction is not classed among the executive duties in the constitution, and it seems impossible to decide that it is, in any respect, a political function.

v. 25.

Sec. 14 seems to have been framed with a studious care to exclude the slightest shadow of judicial discretion on the part of the Governor—for after declaring that he shall issue the commissions to persons for the offices to which they have been elected, it proceeds to remove the only possible ground upon which such discretion might be claimed by the Governor, by further stating: that "person having the greatest number of votes shall be declared to be elected." No inquiry is to be allowed as to the legality of the votes; the person having the greatest number is to be declared elected, and the person elected is to receive the commission. Such has been the uniform construction by the Executive in numerous cases. Even where contestants have objected to the issuing of a commission pending the contest, the Governor has uniformly, until this case came before him, issued the commission, insisting that his duty in the premises was purely ministerial. Such was the course pursued in the contested election cases of *Gambrill vs. Harwood* and *Spence vs. Franklin. Ex-parte Strong,* 20 *Pick.,* 484.

That the Governor may entertain doubts as to the mode of performing a ministerial duty, in no degree renders the particular duty a judicial or discretionary one. The clerks of Courts and sheriffs are purely ministerial officers, but the fact that they may doubt as to the proper manner of issuing or executing a writ, does not render their duties in any respects judicial or discretionary in the legal acceptation of the term, or deprive any individual who is aggrieved by their refusal to act in the manner he supposes proper, of the right to have the correctness of their decision inquired into by the Court under a petition for a *mandamus.* In such a case, if the Court agree with the officer's construction of the particular duty, the writ is refused; if they differ from him, they award the *mandamus.* The discretion which will justify a party in refusing to do an act, must be a legal right to do or

Magruder *vs.* Swann, Governor.

not to do it according to his will. *Kendall vs. U. S.*, 5 *Cranch. C. C. R.*, 238, &c.

Such is the right possessed by the Governor in all matters of a political nature. He is intrusted with the power "to convene the General Assembly on extraordinary occasions," and, since this is a power wholly intrusted to his judgment, it is of no consequence that every person in the State may think the occasion has arrived, unless he shall so decide; and the Courts would properly refuse to listen to any inquiry on the point. And their decision would be the same if the officer whose discretionary powers were thus attempted to be controlled were the Comptroller or any other official intrusted with the legal right to do or not to do the particular acts according to his discretion. *Green vs. Purnell*, 14 *Md. Rep.*, 329.

We insist that the power to issue a *mandamus* against the Governor directing him to perform a ministerial duty, is conclusively established by the weight of authority in this country. *Marbury vs. Madison*, 1 *Cranch*, 158. *Kendall vs. United States*, 12 *Peters*, 524. *Decatur vs. Paulding*, 14 *Peters*, 606. *State vs. Governor*, 5 *Ohio*, 534. *State vs. Governor*, 7 *Id.*, 372. *Pacific R. R. vs. Governor*, 23 *Mo.*, 353. *Att'y Genl. vs. Bainstead*, 4 *Wis.*, 567. *Bonner vs. State*, 7 *Ga.* 480. *Cotton vs. Governor*, 7 *Jones*, (*N. C.*,) *Law Rep.*, 549. *McCauley vs. Brooke*, 16 *Cal.*, 11. *Evans' Practice*, 412. *Life & Fire Ins. Co. vs. Wilson*, 8 *Peters*, 302.

The reasons given in the small number of cases where the contrary position has been announced are, we submit, altogether unsatisfactory. It must be admitted that a Governor can be sued for a debt, or indicted and punished by a Court if he should wilfully injure a person by an official act. Why should not the Court have equal control over him by *mandamus?* *Kendall vs. United States*, 5 *Cranch, C. C. R.*, 258. *Fergurson vs. Kinnoul*, 9 *Clarke & Finnelly*, 279, 1 *Cranch*, 170.

The objection that the Court could not enforce their order because it might leave the Executive Department without a head, is equally unfounded in fact, and inconclusive.  In no possible event would the State be without a Governor, for his office would devolve upon another in case of his disqualification from any cause.  *Constitution, Art.* 2, §8.  But the same reasoning would compel the Court to discharge a Governor proved guilty of murder or deserving to be committed for the most glaring contempt of Court.  Besides, it is impossible that the hands of a Court are to be tied and rendered incapable of dispensing justice by the fear that the sworn Chief Magistrate of the State would deliberately disobey the mandate of its highest judicial tribunal.

The Courts will not assume that the Governor will disobey their decisions.  7 *Georgia,* 480–2.  16 *Cal.,* 45, 55–6, 58, &c.  12 *Peters,* 601–2.  7 *N. C. Rep.,* 549.  *Watkins vs. Watkins,* 2 *Md. Rep.,* 341.  The same dread of a collision and of the necessity of resorting to extreme measures and vacating offices, would prevent the issuing of the writ against any public officer.

The argument urged in this case  against the power of the Courts, based upon the separation of the executive, Legislative and judicial powers of the government, and the denial of the right  to a  person exercising  the  functions of one of those departments to assume  the duties of any other, is an evident perversion of the reason of that provision.  2 *Story on Constitution,* §§ 517, & seq.  5 *Ohio,* 534.  As well may it be invoked as conclusive evidence that the Governor should never exercise a judicial discretion upon any subject, or that the Legislature should never act as a Court for trial of impeachments or contested elections.

The  early history of  the colony discloses  that among the most glaring abuses of the colonial government was the concentration in the hands of the governors of judicial and legistive powers,—the Governor sitting as chancellor, and decid-

Magruder vs. Swann, Governor.

ing upon the legality of his own acts; and it was against such abuses that this provision was directed. "But in every well constituted government, the highest judicial authority must necessarily have a supervisory power over inferior and subordinate tribunals, magistrates, and all others exercising public authority." *Strong's Petition*, 20 *Pick.*, 495.

That the decisions of Courts upon the construction of a Constitution or laws should be entitled to greater confidence than the opinions of the legislative or executive, arises as well from their superior opportunities for correct decision, as from the further fact, that a legislative or executive officer is controlled, in great degree, by his individual judgment, while the decision of the Judge is regulated by the principles of a science independent of his own will.

II. Since the power undoubtedly exists, with respect to all other officials in the State, is there any thing in the prerogative or exalted station of the Governor to exempt him from the control of the law in matters ministerial?

Whatever might be the response to this in England, where the sovereign is the fountain of power, it could never be answered affirmatively in this country, where all power resides in the people. They delegate a portion of their power to the Legislature as their agents; another portion to the Governor and another portion to the judiciary. When the judiciary announces the law to the executive and commands him to obey it, in a case like the present, it is the voice and mandate of the people speaking through one of their constituted agencies to one of their public servants,—and a refusal to obey this mandate is a refusal by an agent to listen to the instructions of his principal, in a matter in which he has been intrusted with no discretion.

"It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a *mandamus* is to be determined." 1 *Cranch*, 170.

The President is amenable to a subpœna *duces tecum* on the application of an individual. 1 *Burr's Trial*, 183, 7. And Mr. Attorney General Butler admitted in the argument in *Kendall vs. United States*, 12 *Peters*, that if the President were required by law to perform a ministerial act, the Courts are competent to order its performance by *mandamus*.

*Mandamus* is now regarded as an action, and not as a high prerogative writ. 12 *Peters*, 615. 24 *Howard*, 97. 2 *Dallas*, 401, 446, 551, &c.

Unless the Courts possess the power to issue this writ against the Governor, this petitioner, and all situated as he, are without any remedy whatever. Elected by the people to valuable office, his election "vested in the officer legal rights which are protected by the laws of his country." . . . . . "To withhold his commission therefore, is an act * * * * not warranted by law, but violative of a vested legal right." 1 *Cranch*, 162. "The government of the United States has been emphatically termed a government of laws and not of men; it will certainly cease to deserve this high appellation if the laws furnish no remedy for the violation of a vested legal right. If this obloquy is to be cast upon the jurisprudence of our country, it must arise from the peculiar character of the case." *Id.*

The exercise by the Courts of the right to direct the Governor in the performance of ministerial duties, would lead to none of the absurd consequences which it is insisted would necessarily flow from it. In the highly improbable case suggested of the election by the people of a negro or an alien, &c., to a judicial station, or of a qualified person at an improper time, the mere examination by the Courts into the propriety of the Governor's refusal to issue a commission, by no means secures the office to the applicant. It is an impeachment of the wisdom of the Courts to suppose that they would decide in favor of claims evidently unfounded; and their decision would, in any such case, sustain the decision of the

Magruder vs. Swann, Governor.

Governor. But whether the pretensions of the applicant are well or ill founded is a question which he is entitled to have determined by the judiciary, and to deny him the privilege of such a decision would indeed be "to cast obloquy upon the jurisprudence of our country." That the judiciary possesses the same power over the Governor as over any other offender in every other form of proceeding, must be conceded; so that he might be mulcted for an illegal act, or even condemned to death by their sentence. And yet they are to start back awe-stricken, and refuse relief to the citizen in a case like the present, whenever they may find themselves confronted by the Governor, from some indefinite notion of prerogative, which can neither be explained nor defended upon principle. What is this but placing the chief officer of the State above the laws of the State, and proclaiming that "Saul, King of Israel, is greater than the Israelites who made Saul King." It is announcing that all men are equal before the law and shall equally obtain a hearing by the Courts, until the shade of the imperial purple is seen among the sober habiliments of the suitors, thenceforth the appeal of the citizen against the Governor, placed in office by his vote, is to fall upon unheeding ears. Such an idea savors rather of the exploded notion of the divine right of rulers to do wrong, than of the republican theory, that the Executive is but "a trustee of the people," and amenable to the laws of the land as expounded by the judiciary. So long as the judges decide correctly no possible evil can result from their interference—and surely they are not to be denied jurisdiction upon the idea that their judgments will be irrational or unjust. All we ask is that the citizen may obtain a hearing from the Courts, and a decision upon the question whether the duty devolved upon the Governor by the law is of a ministerial or judicial character. If the Court shall declare that it is judicial in its nature, we must acquiesce in the decision already made by the Executive. If they shall

pronounce it ministerial, the Governor of course will perform it.

If we are correct in these views, the Judge was in error in refusing the *mandamus* against the Governor, and his orders dismissing the petition should be reversed.

III. But even if his opinion be tenable, that the writ would not lie against the Governor, he was still in error in dismissing the petition against Judge Tuck. Judge Tuck could not rely upon the immunity of the Governor, as his defence for retaining the office. He was only to hold until his successor should be elected and qualified, and the decision of the Special Judge determined that Magruder was duly elected, and the certificate of the clerk of Calvert county showed he was duly qualified. The commission is not essential to the right to administer the oath of office. *Marshall vs. Harwood*, 9 *Md. Rep.* 1 *Cranch.* 160.

The question of title having been decided in favor of Magruder, and he having duly qualified, Judge Tuck could not have refused to yield the office upon the ground of want of a commission by Magruder.

If Judge Tuck had yielded the office to Magruder, after a decision that he was duly elected, and upon evidence of his qualification, no one can suppose that he would not be fully exempted from blame in doing so.

IV. One of the defences raised by the answer of Judge Tuck is, that the judge of a Court cannot be impeded in his own Court, in any proceeding involving his right to the office of judge. But if such a proceeding cannot be undertaken in his own Court, every applicant is utterly remediless, and the judge can hold the office as long as he sees fit to do so. Upon the same reasoning, no indictment or suit could be sustained against a Judge. But in fact, as soon as the Judge shall see from the proceedings that he is an interested party, he is disqualified by the Constitution, and is obliged to

certify his disqualification, and another person is appointed Judge "to try the cause," with all the powers of Circuit Judge while so acting, and the proceeding would, therefore, be in the Court of another Judge. *People vs. Mott*, 3 *Cal.*, 402. 8 *Peters*, 302. *Constitution, Bill of Rights, Art.* 19.

V. It is also contended in both answers, that this was a case of a contested election, and that Judge Magruder should have applied to the House of Delegates in 1864. For what purpose was he to apply? He had received the greatest number of votes, and the majority candidate never applies to the House of Delegates; if any application were proper, it should have been made by the defendant.

But Judge Tuck expressly denies that he was a candidate at either election, and it is clear that sec. 15, Art. 4, on the subject of contested elections, supposes a contest between two or more candidates. By the Act of 1865, ch. 143, sec. 52, the case of contested elections of Judge, is to be conducted in the manner prescribed in the Code, Vol. 1, p. 268, for contested elections of Delegates, and this requires notice to be given "to the person returned," implying a contest, and not an abandonment of the election as is claimed to have been the case in Judge Tuck's answer.

But suppose that Magruder, contrary to every precedent, had applied to the Governor to send the returns to the House of Delegates, and the Governor had consented to do so, what could the House of Delegates have done? They could not have declared Tuck elected, but could only say that Magruder was disqualified from non-age, and not entitled to claim under the election. But he had already admitted this to be so, and declined to claim under it, *cui bono*, then the reference to the House of Delegates. But if this were a case of a contested election, can the hearing of it be postponed indefinitely? If Magruder did not apply, Judge

Tuck might have done so; and it is now too late to inter-pose the objection, even if it ever were of any force.

VI. The answer of Judge Tuck also raises a question as to the regularity of the qualification of Judge Magruder before the clerk of the Circuit Court for Calvert county, upon the ground that it was made before a deputy, &c. The certificate of the clerk under seal is conclusive evidence of the regularity of the qualification. But if it were not so, the Code authorises a qualification before a deputy clerk. *Vol.* 1, *p.* 471, *secs.* 5 and 6. The act of the clerk in swearing in the petitioner was of a purely ministerial character, which he could not have declined upon any pretext, and which he would have been compelled to perform by *mandamus.* 3 *Chitty's Black.,* (265,) *note* 4. By Art. 1, secs. 7 and 8, Mr. Magruder was required to take the oaths thereby prescribed under penalty of being considered as having refused to accept the office. If he had neglected to do so, it might have been argued that the Government must conclude he had refused to qualify, and on that ground was not entitled to the commission; while it is now argued, that not having obtained the com-mission he was not entitled to qualify.

It is submitted that if this irregular course of objection in an answer to a petition for a *mandamus* were permitted to have any effect in this proceeding, it would be widely differ-ent from that intended by the draughtsman of the answer, for it was such a form of pleading that was adjudged faulty in a return in the case of *Marshall vs. Harwood,* 10 *Md. Rep.,* 464; and this Court, for that reason, was compelled to order a peremptory *mandamus.*

We, therefore, submit that the special judge erred in dis-missing the petition against the Governor, upon the ground of want of jurisdiction in the Court to award the writ, and that he likewise was in error in dismissing the petition against Judge Tuck, even if his action in the Governor's case was

correct, because we were entitled to the relief in the latter case even if there were a defect of jurisdiction, as supposed, in reference to the former; and we, therefore, ask for a reversal of the order in the latter case whatever may be the opinion of this Court as to the former.

As the orders of the special judge were only predicated of the questions above discussed, his decision as to the title of Judge Magruder to the office of Circuit Judge is not properly raised by this appeal, but remains as a conclusive adjudication against the incumbent on the question of title.

VII. But if this Court should feel called upon to pass anew upon that portion of the decision below, we will submit for their consideration our views upon the question of title. It is evident that under the Constitution of 1851, the regular mode of filling judicial offices was by popular election; and that in no other mode could a full judicial term be filled. The appointment of judge by the Governor and Senate, or by the Governor alone, was exceptional, and only to fill vacancies until the occurrence of the next succeeding general election. If the appointment of Judge Tuck were to be governed wholly by the Constitution of 1851, it is evident he would have no claim to serve for the whole of the unexpired term of Judge Brewer.

Similar provisions are contained in the Constitution of 1864; and it is equally clear, that if his appointment were to be governed wholly by that instrument, the claim would be equally untenable. But he was appointed under the Constitution of 1851, and retained in office under that of 1864, and the only difficulty in the case arises from this circumstance. It is also observable, that the Constitution of 1864 does not increase the term of office of any elected judge holding over under the former Constitution, but only secures to them the enjoyment of the residue of the term to which they were respectively entitled under that Constitution,

while it shortens the term of the only judge who was in office by appointment at the adjournment of the convention, (Judge Ricaud,) and directs an election to be held in his circuit at the earliest practicable day for a full term.

If the claim in behalf of Judge Tuck, therefore, is well founded, it constitutes an exception to every general rule, on the subject of judicial tenure to be found in the Constitution.

For what term was Judge Tuck appointed on the 24th of October 1864? It is of course clear, that the recital in the commission cannot determine the tenure of the office, but that its duration is to be controlled by the Constitution and laws. *Jeter vs. State,* 1 *McCord,* 233. What right, then, did he derive under that appointment? The former Constitution was then in force, and its provisions on the subject must be consulted. Section 12 of Art. 2, declared, that "in case of any vacancy during the recess of the Senate in any office which the Governor has power to fill, he shall appoint some suitable person to said office, whose commission shall continue in force till the end of the next session of the Legislature, or till some other person is appointed to the same office, whichever shall first occur, and the nomination of the person thus appointed during the recess, or of some other person in his place, shall be made to the Senate within thirty days after the next meeting of the Legislature." It was under this section alone, that Judge Tuck was appointed, and according to its plain provisions his tenure could not extend beyond the end of the next session of the Legislature, and might have terminated on the first day of its session, if the Governor had seen fit to nominate a different person to the Senate.

While Judge Tuck was thus holding under the appointment of the Governor, the new Constitution "went into effect" on the 1st of November, 1864. How did this affect his tenure? It was competent for the Convention to have

terminated his office immediately, but the Constitution, by sec. 6 of Art. 12, called the schedule, declared that " all officers civil or military, now holding office, whether by election or appointment under the State, shall continue to hold and exercise their offices, according to their present tenure, unless otherwise provided in this Constitution, until they shall be superseded pursuant to its provisions, and until their successors be duly qualified.  According to this provision, Judge Tuck was to hold and exercise his office according to his then tenure; and we have shown that his tenure on the 1st of November, 1864, was only " until the end of the next session of the Legislature," after his appointment, viz: until March, 1865, subject to be sooner displaced, if the Governor should see fit to appoint some other person in his place; but subject, also, to be continued until the time for the general election of Delegates under the Constitution of 1851, in the event of his nomination to the Senate and confirmation by that body.

In January, 1865, the Governor sent to the Senate the nomination of Judge Tuck, and his nomination having been confirmed—*Senate Journal*, 1865—he thereupon became entitled to hold the office until the time of the next general election for Delegates under the old Constitution, which was in November, 1865; at which time the election was duly proclaimed and held, and Judge Magruder legally elected.

This view of the subject was regarded at the time of the appointment as the most liberal one for Judge Tuck's claims; and it was in consequence of Governor Bradford's acquiescence in this opinion, that no proclamation for an election for Circuit Judge in this Circuit was made for the November election, 1864.  But it is now insisted that the election in November, 1864, was the proper time for filling the vacancy in the office.  This is maintained in virtue of the proviso at the end of sec. 7 of Art. 12, of the present Constitution, viz: " Provided, however, the judges of the several Courts of this

State, except of the judges of the Orphans' Courts, shall be elected at the regular election, whether for State or county officers, as the case may be, immediately preceding the expiration of the term of the incumbent whose place is to be filled."

If Judge Tuck's appointment in October, 1864, was an entirely different one from the nomination to the Senate, so that the latter was not in any manner connected with or dependent on the former, then the former appointment was necessarily to terminate by March, 1865; and the election in November, 1864, being "the regular election immediately preceding the expiration of the term" for which he was appointed, was the proper time for electing a Circuit Judge. But if the more liberal view of the duration of his appointment, for which we have contended above, be the correct one, and his original appointment, when confirmed, entitled him to hold until November, 1865, then the general election in that year was the one "immediately preceding the expiration of the term of the incumbent, for the incumbent, of course, remained in office until after the election had been held. **3** *Story on Const.*, *sec.* 1552.

But even if November, 1864, were the proper time for the election, Judge Magruder was still legally elected and is entitled to the office. It is admitted that he received "the greatest number of votes" at that election as required by sec. 14 of Art. 4, and was, therefore, to be "declared to be elected" judge. But he was not eligible at the time of the election by reason of non-age. It, therefore, results, that a person "declared to be elected" judge was disqualified by reason of ineligibility from non-age; and by the explicit provisions of sec. 5 of Art. 4, "the Governor by and with the advice and consent of the Senate," was required to appoint a person duly qualified to fill such office until the next general election thereafter, whether for members of the General Assembly or county officers, whichever shall first occur, at which

time an election shall be held as herein prescribed for a judge, who shall hold said office," &c.

The Governor and Senate did appoint Judge Tuck in January, 1865, after Magruder's disqualification was made known, and his tenure under that appointment was, until the general election in November, 1865, at which time Magruder was duly elected judge for fifteen years. The argument that the election of 1864 was void, and that the power given in the Constitution as to the election of judge was "exhausted," is wholly unsupported by reason and authority. The decisions in *Com. vs. Clarke*, 7 *Watts and Searg.*, 127. and *Com. vs. Maxwell*, 24 *Penna.*, 444, answer this objection satisfactorily.

It would be too serious an impeachment of the wisdom of its framers and of its own importance, to construe this charter of our organic law like the technical limitations of a settlement or the over niceties of a special demurrer. The people have established this form of government to carry into effect their wishes—among the most cherished of which is that the judges whose decisions are of such momentous consequence to them shall be chosen by the popular vote, and it seems absurd to say that the accidental disqualification of the majority candidate at an election should deprive the people for half a life time of the possibility of voting for their judicial officers.

Judge Tuck's answer claims that he holds the office for the residue of Judge Brewer's term, "in virtue of his appointment, commission, and confirmation by the Senate." But we insist that the Governor was not authorized to nominate, nor the Senate to confirm, any person as judge for a longer period than "the next general election thereafter." Art. 4, sec. 5.

A more plausible theory, and one which was discussed at the hearing, is this—that by sec. 6, of the schedule, all officers "now holding office, whether by election or appoint-

ment under the State, shall continue to hold and exercise their offices according to their present tenure, unless otherwise provided in this Constitution, until they shall be superseded pursuant to its provisions," &c., and that there are other provisions in the Constitution which entitle Judge Tuck to hold for a longer term than that which was his "present tenure," when the Constitution went into effect.

The only clause in the Constitution which can be supposed to make such other provisions is, sec. 27, of Art. 4. But a careful examination renders it evident that this section can have no such effect, for it clearly refers only to judges who had been elected and not to appointed judges. The word evidently must have the same meaning throughout the section, and in every instance it signifies a choice by the popular vote. Again, the persons who are to continue to serve are to serve out the residue of the time for which they were respectively elected—not for the term for which some other person was elected—and Judge Tuck could as properly claim to serve for the length of time some other of the judges enumerated had to serve, as to select Judge Brewer's unexpired term as the duration of his term of service.

But if elected means also appointed, then Judge Tuck is only to serve out the residue of the unexpired term for which he was elected (appointed)— viz : until the next general election in November, 1865. But it is evident the section was only designed to apply to the indivduals who held the designated judgeships at the time the convention adjourned; and that they were allowed to serve out their terms only because the people had already elected them in the manner prescribed by the Constitution as the settled mode of filling the judicial office. The judge of the second circuit at that time, and at the time of the adoption of the Constitution, was Judge Brewer. The refusal of the con-

vention to allow Judge Ricaud to serve out his term in the tenth circuit, because he was an appointed judge, confirms this view very strongly.

Similar provisions are found in the Constitution in reference to the justices of the Court of Appeals, Art. 4, sec. 17, and the judges in Baltimore city, sec. 37; and the death or resignation of those officers might have left every judgeship for many years in the hands of appointees, in the face of the Constitutional injunction that the people shall have the power to elect their judges.

This Court will not declare this a *casus omissus* if it is possible to find provisions in the Constitution which can reasonably apply to it. If Judge Tuck has a constitutional right to hold the office for seven years more, it is not perceived that the election of another person at a special election ordered by the legislature as suggested, can deprive him of his constitutional term. And if he has the right to hold over under the *casus omissus* for seven years, it seems equally clear that he would have the same right to hold over for twice as long a time.

The construction of clauses of constitutions in great degree depends upon the particular case, but it is submitted that the case of *Com. vs. Maxwell*, 27 *Penna.* 444, is very analogous to the present. See also *People vs. Mott*, 3 *Cal.*, 502. *Lavlass vs. Holmes*, 4 *T. R.*, 660. *Nares vs. Rhodes*, 14 *E.*, 510. *Sansbury vs. Middleton*, 11 *Md. Rep.*, 296. *Marshall vs. Harwood*, 5 *Md. Rep.*, 423 and 7. *Id.*, 466. *Buckingham vs. Davis*, 9 *Md. Rep.*, 334.

*Wm. Price* and *Frank H. Stockett*, for the appellee:

1st. The appellee contends, (treating both cases as the same case,) that it is not competent for the petitioner to invoke the aid of the Court, of which the appellee is the head, and the sole representative, to vacate his office. The petition

25       v. 25.

is addressed to the appellee, as judge, requiring him to entertain a cause, and praying him to order a writ, the effect of which is to strip him of the very authority by which alone the same can be brought to a hearing, and disqualifying him to hold the very position which is recognized by the petitioner in his application, and from whose authority alone can any process be issued, and in whose name alone every writ has to be tested.

It is submitted that such a proceeding as the present involves an anomaly in the law and practice which no Court should be required to entertain, and if established, must be destructive of all self respect which is so essential to guard and preserve the purity and dignity of the Courts. It is insisted that no Court should sanction such practice except when required by express statutory enactment, for which no authority can be found in our laws. And especially should this Court so determine, when they see that the Constitution has provided an adequate remedy in sec. 15 of Article 4, by which the House of Delegates is made the judge of the election and qualification of judges in every case of a contested election.

This reasoning is equally applicable to the case against the Governor, for it is in fact the same case, seeking the same result, and invoking the same authority to enforce the remedy sought.

Nor is the case relieved of the difficulty by the certificate of the appellee declining to sit, and the substitution of a special judge, who still represents the same Court of which the regular judge remains the head, and whose name and by whose authority all process continues to issue.

Nor can any sanction of analogy for such proceeding be derived from the fact that a judge can be indicted for misdemeanors, or sued for breaches of engagements in his own Court. For in all such cases the process is against the person or property of the incumbent, and does not assail the

authority and dignity of the office.    In all such cases, and where he has been of counsel, or is interested in the result of the trial, or of relationship to the parties, provision is made for a special judge, for he is thereby affected in his person or property only, and the office remains intact, but certainly no such cases as the present were ever contemplated by our laws.

2nd. That the Court has no authority or jurisdiction to grant a writ of *mandamus* against the Governor, as the chief executive officer of this State, requiring him to perform duties even in cases where they are purely ministerial, and certainly not to require him to exercise a political power or to discharge a discretionary duty.'

In the case now before the Court the issuing of a commission in certain cases and under certain contingencies, is a duty imposed by the Constitution, and is necessarily political in its character, and faithfully to discharge it requires examination into all the facts attending the right of the party claiming the office, and involves judgment as well as discretion.    It is not a mere ministerial act, because the Governor must determine whether the time for electing a judge had arrived.    This duty, by the whole spirit of our Constitution and laws, must rest with a co ordinate branch of the Government, free entirely from the control of the judiciary.

To clothe the executive with proper freedom in the discharge of his duties, he must enjoy immunity from interference from any other branch of the government.    The contrary doctrine would involve the practical absurdity of requiring the courts to pass orders which they would have no power to enforce, should the executive, as in many cases it would be his right and duty to do, refuse to respect or obey the orders of the courts, or even more than this, it might produce a direct conflict between the different departments of the government, which may produce revolution and civil

war. In support of these views, they refer to the following decisions. *Marbury vs. Madison.* 1 *Cranch*, 146. *Kendall's Case*, 12 *Peters*, 524. *Low vs. Towers*, 5 *Georgia*, 379. 7 *Georgia*, 480. 5 *Ohio*, (*N. Series*,) 528. *Maffit vs. Governor Chase*, 7 *Ohio*, 376. *State vs. Governor of N. Jersey*, 1 *Dutcher*, 333. 32 *Maine*, 508. *Hawkins vs. Governor*, (1 *Arkansas*,) 1 *Pike*, 570. 1 *Kent's Com.*, 288, *and note A.* *Watkins vs. Watkins*, 2 *Md. Rep.*, 341. 23 *Missouri*, 353. *Low vs. Governor*, 8 *Georgia*, 372. *Miles vs. The Governor*, 22 *Md. Rep.*, 170. *Miles vs. The Governor*, 3 vol. *Debates of Con.* 1915, *&c.* *U. S. vs. Seaman*, 17 *How* 230. *Green vs. Purnell*, 12 *Md. Rep.*, 329.

3rd. The court has no jurisdiction in the case, because it is a case of contested election for the office of a judge, which, by the 15th sec. of Art. 4, of the Constitution, is confided entirely to the House of Delegates to decide. To entitle the party seeking this remedy by *mandamus*, he must show, not only that he has a specific legal right to the relief sought, but also that he has no other adequate specific remedy. *Harwood vs. Marshall*, 9 *Md. Rep.*, 83. In the present case not only has the petitioner an adequate specific remedy provided by the Constitution, to determine his right to this office, but by vesting this power in the House of Delegates, all other tribunals are excluded from the consideration of the same matters, and the courts have no jurisdiction to entertain any such cases.

4th. That the appellee is entitled to retain the office and discharge the duties of the judge of the second circuit to the expiration of the full term for which the late judge Brewer was elected, to wit: to Nov. 1871, under his appointment and commission by the Governor and his subsquent confirmation by the Senate. It will be observed that after the adoption of the new Constitution, but before it went into operation, on the 1st day of November, 1864, the appellee was, on 24th October, 1864, appointed and commissioned by

the Governor, in the words of his commission "to hold and execute said office from the date hereof for and during the vacancy occasioned by the death of the late Nicholas Brewer."

This appointment made under the Constitution of 1851, would have held good until the next general election for Delegates thereafter. *Sec.* 25, *Art.* 4. Which would not have occurred until November, 1865, but this having been superseded by the new Constitution, which went into effect on the 1st day of November 1864, and which found the appellee in office as the judge of the second judicial circuit, composed of the four counties, vested him with the tenure of the office until the expiration of the term for which judge Brewer had been elected, and transferred his jurisdiction from the old circuit of four counties, to the present one consisting of the two counties of Anne Arundel and Calvert. He was, at the date when the new Constitution went into effect, the "present" judge of that circuit, and as such, the tenure of his office was expressly limited and prescribed by the 27th sec. of Article 4, as well as the extent of his circuit. And the word in that section "elected," in the 5th line, refers, not to the persons who should actually be found in such offices on the 1st day of November, 1864, but to the character or mode by which such officers generally held their offices, which was by election, and cannot by any reasonable intendment be construed to exclude any person then found in office who held by appointment, and not by election.

5th. But supposing this not to be the proper construction of said sec. 27, of Art. 4, and that the tenure of the office then held by the appellee was not determined by said section, then what was the limit of his tenure? Clearly, it is submitted, only until the election provided for by said Constitution to be held in November, 1864, and until the qualification of the person then elected. Sec. 25 of Art. 4th, Constitution of 1851; sec. 5 of Art. 4th, Constitution, of 1864, and sec. 7 of Art. 12, of same; on the assumption that he

held on under the previous of the present Constitution. And if this be so, then the election for the judge of that circuit could only have been held in November, 1864, and that having resulted in no choice of a person who was eligible, there was no election in fact, and no provision having been made by the Constitution to meet such contingencies, no other election to fill such vacancy can be had until legislative provision shall be made for same. The election held in November, 1865, was, therefore, a void act, and can give to the appellant no claim to the office, but the appellee holds over until his successor shall be duly elected and qualified.

6th. But supposing this court should not be of the opinion that the foregoing construction of the Constitution be correct, it may then become necessary to inquire whether or not the appellee being in office when the present Constitution took effect, his term of office was affected by its provisions, and if so, how?

He will contend in this view of the case :—

1st. That his appointment stands wholly unaffected by the present Constitution, and that, as to his case, a *casus omissus* has occurred.

The Convention failed to make express provision for the case of vacancies occurring between the adoption of the Constitution and the time it went into operation; not one word is said on the subject. The 6th sec. of Article 12, does not reach the case, because by it all persons found in in office were to hold not merely " according to their present tenure, unless otherwise provided in the Contitution," but " until they shall be superseded pursuant to its provisions and until their successors shall be duly qualified," ( not duly elected and qualified.) If no provision is made for superseding them, there can be no qualification of their successors, and it necessarily follows, that they must hold over until this *casus omissus* is supplied, and that can be done

only by the Legislature, which department may exercise all powers not inhibited by the Constitution. Courts cannot supply a *casus omissus.* *Scaggs vs. Rail Road Co.*, 10 *Md. Rep.*, 278.

2nd. If we concede that the convention did not intend to leave any case of vacancy unprovided for, it does not follow that all possible contingencies were actually met by the Constitution. We must gather what they intended from what they said. If anything be said on a particular point, we may infer from that what was meant, but nothing can be collected from what was not said. The provisions in sec. 27th, Art. 4th, that an election should be held in November, 1864, for the 10th circuit, (where Judge Ricaud had been appointed,) may serve to ground an inference that if the probability of Judge Brewer's death had suggested itself to the convention the same provision would have been made for filling that vacancy, but as nothing was said on the subject, we are forced back to the first point, that it must be treated as an omission.

3rd. But suppose it be true that provision was made for an election, was it to be held in 1864 or 1865? If in 1864, then we say that an election has been held and failed of effect, because of the disqualification of the party returned as elected. Here one of two results must follow, either Judge Tuck is entitled to the commission by virtue of that election (Mr. Magruder being under age) or there is another *casus omissus.* The power of the officers of the State to hold an election has been exhausted, and no provision for another made. On this hypothesis the Constitution keeps the government in motion, as far as that office is concerned, by authorising the incumbent to hold until the qualification of a successor.

To illustrate, suppose at the proper time for electing a successor to any of the present judges the person having the highest number of votes should be under age or non-resident, when could another election be held? The Constitution, Art. 12, sec. 7, prescribes the time for holding the election,

"the regular election immediately preceding the expiration of the term of the incumbent." If there be no one *then* elected, who can order another election at any other time ? The Constitution being silent, the power does not exist until the legislature makes provision. 20 *Md. Rep.*, 460. But it is said that the general election in 1865 was the proper time. In what clause is the power to fill this office, at that time, to be found ? Is it contended that no election being made in 1864, the general theory of the Constitution that judicial officers shall be elected *necessitates* an attempt to make a second choice at the succeeding election so that the office may not be vacant ? The answer is, that the necessity does not exist, for under the Constitution the incumbent holds over until his successor is qualified, and that can only be provided for by the same people whose agents allowed the omission through their other agents, the Legislature, which is far safer than to allow the exercise of doubtful powers by other departments.

The general intent may be regarded in the exposition of doubtful phrases, but where the Constitution is silent and nothing is provided in a particular case, the general intent cannot be resorted to. There is nothing for the general intent to explain.

The nomination to the Senate at the session of 1865 does not imply a vacancy under the present Constitution ; Governor Bradford most clearly was only following up the first appointment by showing what he had done under the old Constitution, and the Senate confirmed that appointment as originally made. The Governor could have made no other, because no new vacancy had occurred. There had been no election in 1864. The office had all the time been filled.

If Judge Tuck must be treated as holding a new appointment under the present Constitution, by virtue of that nomination and confirmation, whose vacancy does he fill ? Surely

not a vacancy made by Mr. Magruder. His non-age did not cause a vacancy. The incumbent was to hold until the qualification of his successor, and as the supposed successor never qualified he was never in. To say that his prior non-age made a vacancy is to affirm that one may leave a place he never occupied. When the Constitution, (Art. 4, sec. 5,) speaks of vacancies to be filled by the Governor, it means vacancies occasioned by death, disqualification, &c., succeeding the election of the officer.

The result of the preceding views is not that the commission of Judge Tuck entitles him to hold by its terms until 1871, but that being in office under a valid commission on the 1st of November, 1864, he is entitled to exercise its functions until superseded by the Constitution, and as the Constitution is silent, he holds until the legislature shall make provision, provided this Court shall be of opinion that the 27th sec. of Art. 4, which applies to judges specially, does not meet the case. The 6th sec. of Art. 12, applies to all officers whose cases are not otherwise provided for. See *Taylor vs. Hebden*, 24 *Md. Rep.*, 202, recently decided by this Court, in which it was held that wherever there was a special provision as in the case of judges, found in the Constitution, that shall be regarded in preference to any general provision such as is contained in the 6th sec. of Art. 12. The 27th sec. of Art. 4, applying to judges especially, ought to receive such a construction as will prevent the *casus omissus*, which it is insisted would otherwise arise. This was the view of Gov. Bradford. According to that construction these clauses may be reconciled, if it be held that the 27th section does make other provisions in the case of judges and places these incumbents on the same footing with elected judges.

In conclusion it may be added that the incumbent was commissioned under the 25th sec. of Art. 4, of the Constitution of 1851, and not under the 12th sec. of Art. 2. The

latter relates to vacancies in offices to which the Governor had power to appoint in the first instance, and not to those where another mode of original appointment or selection was prescribed; as to this last class of appointment, special modes of filling vacancies are pointed out. See the clauses relating to Judges, the Treasurer, Comptroller, State's Attorneys, &c.

The administering of the oath of office by the clerk of the Circuit Court for Calvert county gave no right to Mr. M., and could not in any case until after a commission issued to him by the Governor. *Const. Art.* 4, *sec.* 14.

The oath could not have been lawfully administered until after the payment of the tax on the commission, which is not alleged or shown to have been done, but is denied. *Act of* 1862, *Const.*, 282, *sec.* 7.

For the foregoing reasons, it is respectfully submitted, that this Court will sustain the orders of the judge below, not only for the reasons which he gives for said orders, but also decide that there was no vacancy in the office to be filled, or if there was, that the incumbent holds over until the legislature makes provision for the election of his successor.

Bowie, C. J., delivered the opinion of this Court:

In the interval between the adoption and promulgation of the present Constitution, a vacancy, occasioned by the death of the late Judge Brewer in the office of judge of the second judicial circuit, then embracing Anne Arundel, Calvert, Howard and Montgomery Counties, was filled by the appointment of the Hon. William H. Tuck by Governor Bradford, in the recess of the Senate.

By the provisions of the new Constitution, which took effect on the first of November, 1864, the second judicial circuit was reduced to two Counties, Anne Arundel and Calvert.

At a general election held the 8th of November, 1864.

Magruder *vs.* Swann, Governor.

Messrs. Daniel R. Magruder and Wm. H. Tuck were voted for to fill the office of circuit judge of the second judicial circuit. The former received a majority of votes, but being ineligible on account of non age did not claim a commission, and none was issued to him.

At the ensuing session of the General Assembly begun on the 1st of January, 1865, the Hon. Wm. H. Tuck was nominated by the Governor, and by and with the advice and consent of the Senate appointed judge of the second judicial circuit.

On the seventh of November, 1865, a general election for county officers, and an election for circuit judge of the second judicial circuit was held in the counties of Anne Arundel and Calvert, at which the petitioner, a resident of Calvert county, legally qualified, was duly certified and returned by the clerks of the several Counties of the circuit, as having received the greatest number of votes.

The petitioner applied to Governor Bradford for his commission, and failing to obtain the same renewed his application to the present Governor, the respondent, who declined to issue the commission for the reasons assigned in his answer. Being unable to obtain his commission, the petitioner, on the 19th of January, 1866, took and subscribed the oath required by the Constitution, before the deputy clerk of the Circuit Court for Calvert county, and having demanded possession of the office of circuit judge of the incumbent, the Hon. Wm. H. Tuck, and being refused, the petitioner filed in the Circuit Court for the second judicial circuit two petitions, setting forth the above facts, one praying a *mandamus* against the Hon. Wm. H. Tuck commanding him to deliver possession of the office of judge of the second judicial circuit, to the petitioner, the other, praying a *mandamus* against the respondent, Governor of the State, commanding him to issue a commission to the petitioner, as

judge of the said circuit. On the filing of which petitions, the incumbent filed in writing his disqualification to sit in the said cases, and afterwards Reverdy Johnson, Jr., Esq., was appointed special judge, from whose decision these appeals are taken.

These cases presenting the same facts and depending (with a single exception) on the same principles and authorities, having been argued together, all the points common to both will, for brevity and convenience, be disposed of in this, against the Governor. Deference for the high official position of the respondent, as well as the intrinsic importance and novelty of some of the questions, induce us to present the objections to the relief prayed substantially in the language of the answer.

These assume the double form of pleas to the jurisdiction and defences upon the merits.

Under the first class, it is said, the petitioner presents a case of "contested election," in which event the Constitution requires "the Governor shall send the returns to the House of Delegates who shall judge of the election and qualification of the candidates for such election." *Const., Art.* 4 § 15. The "contested election" spoken of in this clause clearly means, (as the context shows,) a contest between candidates at such election, not any dispute about the office of judge, in which one party claims by appointment of the executive, and the other by election of the people. The power given the House of Delegates in such cases is, to "judge of the election and qualifications of the candidates." They have no power to judge of the rights of persons who were not candidates and claim under some other authority, denying, perhaps, the regularity of the election or the right of the people to fill the supposed vacancy. This is the position of the present incumbent of this office. In his answer, (which in the arguments of these cases, as one, is considered common to both,) he expressly denies that at either of the

aforesaid elections he was a candidate for the office of the judge of the second judicial circuit, or in any manner entertained or encouraged the opinion that there was on either of said occasions, any vacancy in the office of judge of the said Circuit, or that any election could on either occasion be held for such judge; the respondent "claiming and believing that in virtue of his appointment, commission and confirmation by the Senate as before stated, he held the office of said judge for and during all the residue of the term to which the said Nicholas Brewer had been elected as aforesaid; and this respondent still claims and believes, and so insists, that he is entitled to be such judge, and to hold said office," etc.

The second objection to the jurisdiction is, "that no judge can be rightfully called upon to oust himself of the jurisdiction he exercises." This is not based upon any authority, but rests altogether upon arguments derived from what is supposed to be due to the dignity of the bench, and the preservation of its purity. The provisions of the Constitution, for the trial of causes, in case of the disqualification of the incumbent, (Art. 4, sec. 7 and 8,) are said to apply only to cases where the judge is affected in person or property, but not to those involving his right to his office. Neither the language of the Constitution, nor its spirit, in our judgment, warrants any such limitation to its meaning. An office is often the most valuable property a person possesses. If the owner of land, goods or chattels may come into the Court in which the judge presides, and demand a writ against him for an injury to these, what conceivable reason is there for excluding one who claims the high functions of the judicial office to which a salary is annexed, which he charges is withheld from him by the incumbent? The dignity or purity of the bench is not more impeached in one case than the other. These can only be vindicated by submitting such claims to some disinterested and impartial judge who will declare the right.

The seventh section of the 4th Art. of the Constitution, declaring "no judge shall sit in any cause wherein he may be interested, etc, is but a repetition of a cardinal maxim of justice and the common law. The State is the fountain of justice. Courts are but the conduits through which it is distributed, and judges are the organs of the Court. The theory of all republican government · is that the judicial function is a public trust for the protection of society. The Court personates the majesty of the law, before which, all men are equal, "*ubi jus, ibi remedium.*" The Court and judge are by no means an unit. They co-exist, but not always in the same person. The Court is open to all suitors even against the judge himself. His authority extends to all cases in which he is not disqualified by interest, relationship to the parties, or former professsional connection with the cause; when these occur, his power as judge ceases, except to certify his incapacity to act.

It would be a singular defect in a system of government, where the judiciary are elective, if there should be no tribunal, in which the right to the most important of offices can be determined. No disqualification of a judge can be so obvious and so absolute as that which involves the question of his title to the office he occupies. When that is questioned he comes immediately within the letter and spirit of the seventh section of Art. 4, above cited, and no alternative is left but to certify his disqualification. This view seems to have been taken by the learned incumbent of the office, as he immediately certified his inability to sit, and a special judge was appointed; yet he, as well as the respondent in this case, pleads and relies on this defence to the powers and jurisdiction of the Court. . But for the earnest reliance upon this plea to the jurisdiction, we should not have deemed it necessary to enlarge so much upon a point which we consider so untenable.

The third plea to the jurisdiction is, "the Governor cannot be called upon to answer before the Courts for the manner in which he may administer his branch of the Government." The proposition presented by the plea in its general form is one of which there could be no doubt. No Court in this Country has ever made any such pretension. The question is, whether the Governor may be required by *mandamus* to do some specific thing or act which the Constitution, or law, requires him to do, and in the execution of which he is a mere minister of the law and has no discretion. This Court has recently endeavoured to distinguish between the exercise of the political and discretionary powers of the Executive Department and the ministerial duties. Bearing in mind the injunction of the Declaration of Rights that the several departments of the Government should be separate and distinct and no person exercising the functions of one of said departments should assume or discharge the functions of the other," we must look to the Constitution to see how those powers are distributed. They are divided and classified into Articles, distinguished as Art. 1, The Elective Franchise; Art. 2, The Executive department; Art. 3, The Legislative department; Art. 4, The Judiciary department, etc.

The duties of the Governor are not however all found in Art. 2, Entitled the Executive, on the contrary the duty now in question is found in Art. 4, sec. 14, as an incident to the election of judges and other officers. After providing for the election of judges, that section requires " all elections of judges and other officers, provided for by this Constitution (States' Attorneys excepted) shall be certified and the returns made by the clerks of the respective counties to the Governor, who shall issue commissions to the different persons for the offices to which they shall have been respectively elected, and in all such elections the person having the greatest number of votes shall be declared to be elected "

"Sec. 15. If in any call of election for Judges, Clerks of the Courts of Law, and Registers of Wills, the opposing candidates shall have an equal number of votes, it shall be the duty of the Governor to order a new election; and in case of any contested election, the Governor shall send the returns to the House of Delegates, who shall judge of the election and qualification of the candidates at such election."

Sec. 16. All public commissions and grants, shall run thus: "The State of Maryland, etc," and "shall be signed by the Governor with the seal of the State annexed," etc.

These are auxiliary ministerial duties imposed on the Governor preliminary to the qualification of the judges and other officers, in the discharge of which, he has been invested with no discretion but is imperatively required by the organic law to perform in order to keep the departments of government in motion.

The clerks' certificates determine "who has the greatest number of votes," or whether "the opposing candidates have an equal number of votes." In either event the injunction of the Constitution is equally peremptory. The Governor does not make any inquiry beyond, and is ordinarily concluded by them. All public commissions and grants are included in the same section and sentence as analagous in their nature. If the petitioner now sought for a *mandamus* for a patent or grant upon a warrant for land which had passed through all the formalities of the land office, would any doubt be entertained of the result? The Governor acts alike in both instances as the costodian of the great Seal of the State to be annexed to his sign manual.

This is not like the case in which, previous to the adoption of the present Constitution, the Governor was specially invested with large powers delegated to him solely requiring the exercise of great judgment and discretion. There, was a *quasi* judicial function to be executed upon certain conditions, of which he was to judge.

Magruder vs. Swann, Governor.

It may be said the Governor in all instances must be satisfied of the regularity of the returns of the clerks. Ordinarily, he possesses no control over them, but acts upon the "*prima facie*" result. If they are irregular, the parties interested have their remedy by contesting the election before the appropriate tribunal.

The commission, like a patent, is primary proof of the title of the officer or patentee, but the Courts may inquire whether the one or the other was properly issued. In many instances, the commission is a necessary prerequisite to the right of qualification to office. Each of the co-ordinate departments of the Govenment is independent of the other in the sphere of its action, and has duties to perform in which it is not subject to the control of the other. But this independence does not proceed from the grade of the officer so much as the nature of the act to be performed.

The Governor, in his political and executive duties requiring the exercise of his judgment and discretion, is entirely independent of any other authority. But all judicial power is as absolutely committed to the Judiciary Department, as political or executive power is to the Governor. Among these judicial duties is the decision of controversies between man and man, whether they involve the right to office, life, liberty or property, or arise under the provisions of the Constitution, Statute or Common Law. We are sustained in these views by the very lucid and forcible opinion of the Supreme Court of Ohio, in the case of *Whiteman vs. The Governor of Ohio. 5 Ohio Rep.*, 533, 535, in which all the preceding cases are reviewed. See also *Cotton vs. Ellis, 7 Jones N. C. Rep.*, 549. *Marbury vs. Madison, 1 Cranch*, 137.

The application of these principles to the higher officers of the Executive department of the Federal Government, was made in Kendall's case, but the Court discriminated between constitutional duties imposed on the President or

Chief Magistrate, and duties imposed on subordinate officers by law. It said, it by no means follows that every officer in every branch of that department (the Executive) is under the exclusive direction of the President, " Congress had the right to impose upon any executive officer any duty they may think proper which is not repugnant to any rights secured and granted by the Constitution, and in such cases the duty and responsibility grow out of the law, and are subject to its control and not to the direction of the President. All the judges, however they differed on other points, were of opinion that the Act requiring the Post Master General to give a certain credit was a mere ministerial Act, and a *mandamus* was ordered.

In the case of *Decatur vs. Paulding, Secretary of the Navy,* 14 *Peters,* 497, the Court thought the duty imposed by Act of Congress on the Secretary, in relation to the claim of the relator, was a discretionary duty, with which they could not interfere, and the *mandamus* was refused.

The case of the *Pacific Rail Road vs The Governor,* 23 *Missouri,* determined nothing definitely as to the liability of the Governor to a *peremptory mandamus.* After reviewing the authorities *pro* and *con.* the Court said : " The question involved in this case, about which our opinion alone is sought, is presented in such a way by the argument of the parties as to render it unnecessary to decide whether a *mandamus* can issue to the Chief Executive requiring him to do any act. Nor do we determine it or preclude him from insisting on his exemption from it." A rule *nisi* or alternative writ was granted.

The Supreme Court of Geo. in the case of *Bonner vs The State,* 7 *Ga.,* 480, after reviewing many cases, held that the relator ought to have proceeded against Bonner (who held by color of right under a commission,) by "*quo warranto,*" and obtained a judgment of ouster against him. The

legality of the relator's claim being thus established by a final judgment of a Court of competent jurisdiction, the relator should then apply to the Governor for a commission, who would not hesitate to issue it, for the reason that such judgment of a Court of competent jurisdiction, as to the validity of the relator's election and his right to a commission would afford the Executive the most conclusive evidence of the fact that the relator was the individual legally elected to the office in question. If the Executive refused to issue a commission to one whose right had been judicially determined, it was held a *mandamus* would lie. In the subsequent case of *Lowe vs. Towns, Governor of Ga.*, 8 *Ga.*, 360, the same Court, reviewing all the authorities in answer to the question, " why may not the Governor, when the performance of this ministerial act so required by law is essential to the completion and enjoyment of individual rights, be considered " *quoad hoc*," not as an executive, but as a merely ministerial officer, and therefore liable to be directed and compelled to perform the act by *mandamus?* responded: " Viewed as a strictly legal question, we cannot offer any satisfactory reason why he should not according to general principles of law; and it was in this point of view alone this question was considered by this Court in *Bonner vs. Pitts;* indeed, no other view of it was presented for our consideration on the argument of the case. But while we are unable to give a satisfactory legal reason why the remedy sought should be denied the citizen, yet we are satisfied that for political reasons alone the remedy by *mandamus* ought not to be enforced against the Chief Executive officer of the State."

The case of *Hawkins vs. Governor*, 1 *Ark.*, 570, is to the same effect. After citing these cases this Court, in the case of *Miles vs. Bradford*, thus summed up their result. The general principle laid down in all these, almost without exception, is, "that where the act to be done requires judgment

and discretion in the officer against whom the *mandamus* is prayed it will be refused," referring to the cases collected in 12 *Md. Rep.*, 336. 17 *How'd*, 230. Notwithstanding their annunciations of the general principle to be deduced from the cases, it is supposed that this Court, by their citations from 8 *Ga.*, and 1 *Ark.*, so far adopted them as to be bound by their application to the facts involved in them.

The most casual examination of the opinion in *Miles vs. Bradford* shows, that the gist of that case was the character of the function to be exercised, whether the act to be done was political, *quasi* judicial, or ministerial. The former classes of powers were shown to be beyond judicial control, the latter to be within the jurisdiction of the Courts. The exigency of occasion requiring immediate decision, the Court's opinion was professedly but an announcement of the conclusions arrived at, with a brief reference to some of the authorities relied on.

The cases cited were used to sustain the position that the Executive in his political or discretionary powers was beyond all judicial interference, not to sanction the application of the principle to the facts of each case. Although it was said in that case that the Governor bears the same relation to the State that the President does to the United States, and in the discharge of his political duties is entitled to the same immunities, privileges and exemptions. It is nowhere said that the President or Governor, in the discharge of mere ministerial duties would be exempt from judicial process.

The deduction from a comparison of all the authorities cited is, that the Governor, like all other officers in the discharge of mere ministerial duties, is subject to the writ of *mandamus,* which cannot be denied to a suitor in such a case without acknowledging an authority higher than the law.

The jurisdiction of the Court being thus established, it

remains to examine the questions arising upon the construction of the several clauses of the Constitution referred to, and determine which of the claimants to the office is entitled.

The respondents rely on the 6th section, Art. 12, entitled schedule, which declares "all officers, civil and military, now holding office, whether by election or appointment under the State, shall continue to hold and exercise their offices according to their present tenure, unless otherwise provided in this Constitution, until they shall be superseded pursuant to its provisions, and until their successors be duly qualified."

The tenure referred to, the respondent insists, was under the 20th sec. of the Constitution of '51, until the next general election of delegates thereafter, which election was, by the 7th section of the 12th Art. of the new Constitution, held on Tuesday after the first Monday of Nov., 1864. At which election, the petitioner not being elected by reason of his non-age, and the failure to elect not being by reason of a tie vote, there is no provision in the Constitution for another election, and the powers or provisions of the Constitution were exhausted by the election of 1864. The case, therefore, presents a "*casus omissus*" in the new Constitution, which can only be supplied by an Act of the Legislature. According to which construction, the incumbent will hold and exercise his office under the 6th section of the 12th Art., until his successor be duly elected and qualified. As an alternative proposition, it is insisted, if there is any provision in the Constitution for the occurrence of a vacancy in the judicial office between its ratification by the people, and the time it went into effect, such provision is found in the 27th sec. of the 4th Art., the language of which is "the present judges of the Circuit Courts shall continue to act as judges of the respective Circuit Courts within the judicial Circuits in which they respectively reside until the expiration of the term for which they were respectively elected, and until their successors are elected and qualified," viz: etc. By the

true construction of which Article it is contended, the in-cumbent, under his present commission, is entitled to hold his office until the expiration of the time for which the late Judge Brewer was elected.

The alternative view of the respondent—that if there is any clause of the Constitution of 1864 providing for the supply of a vacancy occurring between the adoption and the taking effect of that instrument, it is the 27th section of Article 4—is negatived by the language of that section alone, which no verbal criticism can enlarge so as to embrace judges appointed by the Governor. However interpreted, whether as speaking at the time the instrument was framed or at the time it became effective, it has a special exclusive sense which cannot be misunderstood. No latitude of construction can justify the reading of "elected" as the synonym of "appointed." The general policy of electing the judiciary, impressed on every clause of the Constitution as well as its language, makes it impossible to construe the word "elected" in any other than its accepted popular sense, chosen by the people. This view, therefore, must be rejected.

The continuing clause, being the 6th section of the schedule, Art. 12, is, then, the only section of the Constitution on which the claim of the incumbent rests. The office of that clause is to preserve the machinery of the government in the change from one Constitution to another. Its operation is not to suspend the authority of the new Constitution, but to preserve or continue the corps of officers holding under the old or former government, until their successors or themselves were appointed under the new. This is illustrated by the case of *Watkins vs. Watkins*, 2 *Md. Rep.*, 353. John N. Watkins, the appellee in that case, under the Constitution existing prior to 1851 held the office of Adjutant General during good behavior. The Constitution of 1851, provided that the Adjutant General shall be appointed by the Governor, by

and with the advice and consent of the Senate, and that he shall hold his office for the term of six years. The 8th section of the 11th Art. contained a continuing clause in the same language as is used in the present Constitution. It was held the Governor could not *per se*, without the advice and consent of the Senate, appoint a successor to the incumbent, but he might be superseded by the concurrent action of the Governor and Senate. The Court further held that "in the event of resignation, death or removal of the officer during the recess of the Senate, the Governor would have the right to issue a temporary commission, because, in that case there would be a vacancy which he would be authorized to fill."

In the case of *Cantwell vs. Owings*, 14 *Md. Rep.*, 215, this Court upon an inquiry into the validity of the appointment of a Justice of the Peace to fill a vacancy occurring in that office, held the vacancy could not be filled by an appointment of the Governor under the general appointing power of the then Constitution, when by a particular provision of the same instrument another mode of filling the vacancy was clearly and explicitly provided. These two decisions furnish a key to the solution of the present question, as far as is material to the merits of this case; the 11th and 12th sections of Art. 2 of the Constitution of '51, construed by the Court in the case of *Watkins vs. Watkins*, correspond with, and are identical in sense with the 13th and 14th sections of Art. 2 of the Constitution of '64, and the 25th section of 4th Art. of the former, with the 5th sec. of 4th Article of the latter, with an exception hereinafter referred to.

The appointing power conferred on the Governor by these several sections is original, secondary and special. The original includes all civil and military officers of the State whose appointment or election is not otherwise provided for. The secondary, all vacancies occurring during the recess of the Senate in any office which the Governor had power to

fill. The special, such as are particularly provided for, as in the 25th and 5th sections of Art. 4, of the Constitution of 1851 and 1864. Under these provisions, as interpreted in the foregoing cases, an actual vacancy having occurred in the office of judge by death, it was competent for the Governor to fill the same by issuing a temporary commission which continued in force "to the end of the next session of the General Assembly or till some other person is appointed to the same," etc. *Art. 2, sec. 14, Constitution* 1864. This commission, by the continuing clause, (schedule, sec 6,) carried the incumbent over the interval between the appointment and the meeting of the General Assembly of January 1865. The Governor then, by and with the advice and consent of the Senate, appointed the incumbent to fill the vacancy (which had occured in the recess of the Senate,) "until the next general election thereafter, whether for members of the General Assembly or county officers, whichever shall first occur," (Art. 4, sec. 5, Constitution 1864,) under the special provision, which according to the principle of *Cantwell vs. Owings* cannot be disregarded, being the mode of filling the vacancy, clearly and explicitly provided. Holding under this appointment, the incumbent cannot, we conceive, hold the office for and during the term for which his predecessor was elected. His authority is derived from the 5th section of Art. 4, of the Constitution of 1864, which expressly limits it as above indicated, which by legal intendment and construction is extended to the election and qualification of his successor. *Vide Sappington vs. Scott,* 14 *Md.* 53 *to* 56. *Thomas vs. Owens,* 4 *Md. Rep.,* 189.

The election for county officers occurring in November, 1865, the period arrived at which an election was to be held to fill the vacancy thus temporarily filled. The result of that election, as certified by the clerks, designates to whom the commission should be issued. The certificates of the clerks of the several counties composing the second judicial

circuit showing that the petitioner had received the greatest number of votes for judge of that circuit, in the language of the Constitution, he should " be declared to be elected," and receive a commission from the Governor for the office to which he has been elected.

This Court will, therefore, reverse the order of the Court below dismissing the petition of the appellant, and direct a *mandamus* to be issued as prayed.

*Petition dismissed.*

(Decided June 28th, 1866.)