# CIRCUIT COURT OF BALTIMORE CITY

Filed May 31, 1900.

THE NORTHERN CENTRAL RAILWAY COMPANY
VS.
JOSHUA W. HERING, COMPTROLLER OF THE STATE OF MARYLAND, ET ALS.

*Bernard Carter* and *John J. Donaldson* for plaintiff.

*Attorney-General Rayner* for defendants.

WICKES, J.—

When I sustained the demurrer in this case and dismissed the plaintiff's bill, it was not possible to file my reasons for so doing, because of the pressure of other business at the time. It is proper, however, in a case involving such large interests to state as briefly as I can, the view I have taken of the questions presented.

In 1854 when the projectors of the present Northern Central Railway Company were about to organize it by connecting various lines of road running between Baltimore City and Sunbury in the State of Pennsylvania, it was found that the large interest held by the State of Maryland in the Baltimore and Susquehanna Railroad, the Maryland link in the line, must in some way be provided for, before the plan of consolidation could be carried out. The indebtedness to the State secured by liens amounted to nearly $2,000,000, and the accrued interest thereon amounted to nearly a $1,000,000. In addition to this the State held 2,000 shares of the capital stock of the Baltimore and Susquehanna Road.

The railroad company evidently memorialized the State in reference to this matter, as in the message submitted by Governor Lowe, at that time in office, to the Legislature, three propositions were referred to as suggested for the accomplishment of the object in view:

1. That the State should retire from its position as preferred creditor and give priority to new creditors.

2. That the State should in lieu of its indebtedness take the position of a simple stockholder, and thus give the company power to confer priority upon the new indebtedness which it was necessary to incur.

3. That the State should consent to a *sale* of its interest in the road.

The third proposition was accepted and it resulted in a *sale* of the State's entire interest in the Baltimore and Susquehanna Railroad, including its 2,000 shares of capital stock, to the Northern Central Railway Company, the complainant, upon the terms authorized by the Act of 1854, Ch. 260. This Act is entitled an Act to provide for the *sale* of the interests of the State in the Baltimore and Susquehanna Railroad Company, and authorizes a conveyance of its interest whether as "creditor, stockholder, mortgagee or otherwise," to the Northern Central Railway Company, when-

ever it shall have been duly established and erected, and shall have executed "a mortgage to the State of Maryland of the entire line of railroad belonging to said company," * * * "to secure to the State of Maryland the payment of the annuity hereinafter mentioned."

It is enacted in Section 2 of the Act, that the said consolidated company shall in the execution of this mortgage, "covenant and bind itself to pay to the State an annuity of $90,000 a year in quarterly payments."

It is further provided "that the said annuity shall be subject to be extinguished at any time within ten years hereafter upon the full payment of $1,500,000, with interest that may be due by the said company, who shall have the privilege of paying off the same in installments of not less than $100,000 each, and of obtaining a rateable reduction of the annuity, computing the same at 6 per cent. on each payment so made."

Section 3 of the Act provides that the mortgage required to be given "to secure said annuity" shall contain the usual conditions in such deeds, with a clause to authorize the sale of the mortgaged property at any time after three months subsequent to a default of the company to pay the whole amount of the annuity which may fall due in any one year, etc."

The terms of sale provided for by this Act of the Legislature, passed at the instance of the Railroad Company, were complied with, and the sale was consummated of the entire interest of the State, "whether as creditor, stockholder or mortgagee" in the Baltimore and Susquehanna Railroad Company to the Northern Central Railway Company, and the purchase price, to wit: an annuity of $90,000 a year, was agreed to be paid and its payment secured by a mortgage on the entire line of the Northern Central Railway, executed in exact conformity with the Act of the Legislature.

Under this contract, the terms of which are set forth in the Act referred to, the plaintiff asserts its right to redeem and extinguish the annuity by paying into the State treasury the sum of $1,500,000, and has filed this bill to compel the State's officers to accept it and to restrain them from negotiating any sale thereof under the provisions of an Act recently passed authorizing

a sale of this among other securities held by the State.

The State has demurred to the bill, denying the right of the complainant to pay off its indebtedness at all—and also its right to sue the State in effect, by bringing its officers into Court under such circumstances as we have in this case.

Apart from the more technical questions involved in the second ground of demurrer above referred to, it is desired by all parties to this controversy, that a decision shall be had upon the real merits of the questions presented, for it is obvious that upon the result depends the value to either the company or the State of more than a million of dollars in excess of the amount tendered.

The real inquiry then, as said by complainant's counsel, is whether the transaction was a creation of an annuity subject to a limited right of redemption, or a mortgage to which the right of redemption without time limit is in law a necessary incident. The principles of law which control the respective contentions are so well settled that authorities need scarcely be cited in support of them.

If it is to be dealt with as a mortgage, then the time limit referred to would not apply, and the complainant could exercise its right of redemption at any time it saw proper to do so.

But if on the other hand it is to be considered as an annuity, subject to a right of extinguishment in a certain specified time, the right would not survive the period fixed by the parties themselves. There is no difference of opinion as to the law itself, but only as to its application to the facts before us.

It is necessary in order to invoke the rule of law contended for in this case to show either an antecedent indebtedness or a contemporaneous loan. Clearly there was no contemporaneous loan under the facts before us. The contention of the plaintiff seems to be based largely upon the ground that there was an antecedent indebtedness which the mortgage was intended to secure, and that, therefore, when that indebtedness is discharged the mortgage is at an end. Courts unquestionably do look into all such transactions to see whether such is the fact or not, and incline in all doubtful cases to

treat the instrument as a mortgage and open to redemption on payment of the sum secured.

But in this case how can it be said that there was any antecedent indebtedness from the Northern Central Railway Company to the State of Maryland? The indebtedness was from the Baltimore and Susquehanna Road to the State, and the debtor company went out of existence when the company complainant was organized. Because the Northern Central bought outright the State's claim against the Baltimore and Susquehanna Road, and its 2,000 shares of stock, it can scarcely be said to occupy the same position as debtor as the Baltimore and Susquehanna Company would have occupied had it survived. I cannot, therefore, accept the view of the case so earnestly presented by the learned counsel for the complainant, as the foundation principle is swept away by the mere statement of facts. Again, it was said, that because the State has the right, under the Act of 1854, and the mortgage executed in accordance with its terms, to authorize the *Sale* of the mortgaged property *"to pay the whole amount of the annuity"* in event of a default by the company, that therefore the company has a right to redeem, because "foreclosure and redemption are correlative."

The case chiefly relied upon in support of this view, 2 Hare 326, as applied to the facts before us, is scarcely in point. It was mainly a contest as to the proper interest to be charged under the statute of Will. 4. The Vice Chancellor did say, in answer to the argument, that a foreclosure suit was not a suit for the recovery of money within the meaning of the 42nd section of that statute, that as a "general proposition the relative rights of mortgagor and mortgagee are the same in a bill to redeem as in a bill to foreclose, at least as to the price of redeeming the mortgage." But that was the case of a bond and mortgage, and nobody questioned the rights of the parties, except as to the *amount* of interest, and incidentally, of the amount of principal involved.

But the question here is the right to redeem at all. Certainly the State can exercise no power of sale except upon default of the company to pay the annuity, and no default having taken place at the time the bill was filed, it cannot be said that the right to sell existed at all. It would present a strange condition of things if, under such circumstances, the company could by making default confer this right upon the State and then take advantage of its own wrong to extinguish its annuity and redeem its mortgage.

It has twice happened during the forty-five years since this annuity was created that the company defaulted in its payment, but in both instances during the ten-year period it had the right to extinguish by paying $1,500,000 into the State treasury.

In the one case (Nor. Cent. R'y vs. State, 17 Md. 8) the State sued upon the covenant in the mortgage to recover the *arrears of the annuity*, and in the second a bill was filed (State vs. Nor. Cent. R'y Co., 18 Md. 193) praying for relief in various forms.

1. To sell the property to raise the sum of $1,500,000, the estimated principal value of the annuity of $90,000.

2. To appoint receivers to take charge of the property and apply its earnings to the payment of the arrears of the *annuity*. At that time the company had a right to "extinguish the annuity" by paying $1,500,000, and the "correlative" right of the State, had it been permitted to proceed to extreme measures, would have been limited to that amount. In neither case does the Court refer to this right to sell, but in both cases the only remedy permitted was, by the appointment of receivers, to collect the arrears of the annuity due the State. It was treated throughout both litigations as an *annuity*, and not a mortgage, except so far as its covenants could be resorted to to enforce payment of any arrears.

Turning to the State's side of the case, which has been so fully and ably presented by the Attorney-General, I need only say that I concur in the view he has taken of the question involved. I can see no earthly reason why the Northern Central Railway Company could not enter into just such a contract with the State as was done under the Act of 1854. It was, presumably at least, to its advantage at the time to do so, and it saw proper to buy outright the State's interest in a defunct corporation for an annuity of $90,000. To create this annuity and secure its payment, it gave an annuity mortgage on its road, and now to say that

the mortgage controls and not the annuity, is simply sticking in the bark of construction.

It was "nominated in the bond" that the right of extinguishment of this annuity should exist for ten years, and that period having long since expired, the right no longer exists. There is nothing especially new about contracts of this character. Annuities are well recognized in our own State and elsewhere, as forms of investment, and Best, J., referring to them in Winter vs. Mousley, in 2 B. & A. 806, says: "I have always understood the meaning of an annuity to be where the principal is gone forever, and it is satisfied by periodical payments." In P. &. R. R. R. Co. vs. Stitcher, 11 Week, Notes Cases, 325, Judge Paxon speaking of a loan, and not of the *purchase* of an annuity as we have here said "I see no legal objection to a contract for a perpetual loan. * * * Such transactions are common in England and are not unknown in this country." It all depends upon the intention of the parties. In Hinckley, executors, vs. Wheelright, 29 Md. 348, a case much relied on by the State, the question arose as to whether the transaction was a conditional sale, or to be dealt with as a mortgage, the time having elapsed within which the grantor had a right to repurchase the property. Judge Miller, delivering the opinion of the court, said: "This is what the books call a conditional sale. The right to make such contracts being conceded, we see no limitation that can be placed on the conditions upon which the parties may choose to agree fixing the contingency upon which the deed is to be void or to remain absolute. And what objection can there be in so treating the transaction? The fact that the parties previously stood in the relation of mortgagor and mortgagee rather strengthens than otherwise the position that this was a conditional sale of the equity of redemption in this particular estate." The learned judge further on refers to the use of the words "security," "redeem" and "foreclose," running through the correspondence of the parties, and in the papers themselves, which were relied on as evidencing an intention that the instruments in question were to operate simply as a mortgage for the security of the debt. "Such it is true are the phrases usually employed when mortgages and instruments intended as security merely are spoken

of. But in these deeds and papers we find no such use of them as will warrant us in concluding that such was the intention of the parties, in face of the plain purport of the instruments themselves and the express and unequivocal language used in other parts of them."

So, without adverting further to the argument or cases so fully set forth in the defendant's brief, I conclude upon this branch of the case that the annuity must be treated as irredeemable, and that the complainant has no right to extinguish it by paying the fifteen hundred thousand dollars it has tendered the State. The demurrer presents also the questions of laches and limitations, which cannot, I think, be successfully invoked under the facts before us.

It was insisted, however, that the complainant had no right to maintain this suit upon the well-settled principle that the State, the sovereign, cannot be sued in its own courts without its consent. The distinction sought to be taken by the complainant is, that it is simply calling upon the State's officers to perform a "ministerial duty," but the cases cited scarcely sustain this view. In Thomas vs. Owens, 4 Md. 190, the court said: "When there is an appropriation and a proper warrant drawn by the Comptroller and presented to the Treasurer, his duty is purely *ministerial.* All he has to do in such a case is to count out the money; an act ministerial and nothing else."

In Magruder vs. Swann, 25 Md. 173, the court simply decided that in a contested election case "The Governor may be required by *mandamus* to do some specific act which the Constitution or law requires him to do, and in the execution of which he is a mere minister of the law and has no discretion."

In Groome vs. Gwinn, 43 Md. 573, another contested election case, the court decided that it was the clear meaning of the Constitution that commissions should issue as soon as the result of the election could be ascertained, and that as issuing the commission and administering the oath of office was merely a ministerial duty imposed upon the Governor, the writ of *mandamus* would lie to direct their performance.

The next Maryland case relied upon by complainant in support of the jurisdiction of the court, is Leonard vs. Wiseman, 31 Md. 201. But I do not

see that it throws any light on the subject under discussion. It involved the construction of an act of the Legislature, which the court held the Comptroller of the Treasury could be required by *mandamus* to obey.

The Federal cases chiefly relied upon to sustain the contention of the complainant are the Board of Liquidation vs. McComb, 92 U. S. R., 531, and United States vs. Lee, 106 U. S. R., 196.

Commenting upon these cases, the Supreme Court, in Louisiana vs. Jumel, 107 U. S. R. 725, said: "The Board of Liquidation vs. McComb arose under the same Act of 1874 that we are now considering. The Board was there enjoined at the instance of bondholders from admitting to the privileges of the compromise proposed by the State certain persons other than those originally provided for and on different terms. And this clearly because the Board was by the very terms of the law charged with the duty of exchanging the bonds specifically set apart by the contract for a particular purpose, and every bona fide bondholder, by accepting the compromise offered, became personally interested in securing the due administration of the trust which had thus been committed to the Board. In fact, the Board held the new issue of bonds in trust, and every one who gave up his old obligations and accepted the new in settlement became a beneficiary under the trust and might act accordingly."

Referring, then, to the Jumel case, under consideration at the time, the court proceeded to say: "In this case, however, there is no such trust. * * * The relators do not occupy the position of creditors of the State, demanding payment from an executive officer charged with the ministerial duty of taking the money from the public treasury and handing it over to them, and, on his refusal, seeking to compel him to perform that specific duty."

In the Lee case, it was held that the officers of the United States, holding in their official capacity the possession of lands to which the United States had no title, could be required to surrender their possession to the "rightful owner."

Certainly all the cases referred to differ materially in their facts from the one at bar, and are only important as showing what is meant by "ministerial duty." But here we have no appropriation of a specific sum of money to be paid—no constitutional requirement that a State officer perform a specific act—no violation of a trust, by admitting others not interested to participate in a compromise provided for by law—no question of title to real estate illegally held by an officer of the Government. But in this case the bill is filed against the State officers in their official capacity, to require them to accept in payment of a State claim arising under a contract a much less sum of money than is believed to be due. It is in the nature of a specific performance of a contract, about the construction of which, the parties differ.

The principle laid down in, In re, Ayers et als, 123 U. S. R. 504, seems to be nearer the question before us. Mr. Justice Matthews, delivering the opinion of the court, said: "But where the contract is between the individual and the State, no action will lie against the State, and any action founded upon it against defendants who are officers of the State, the object of which is to enforce its specific performance by compelling those things to be done by the defendant, which when done would constitute a performance by the State, *or to forbid the doing of these things, which if done would be merely breaches of the contract by the State*, is in substance a suit against the State itself, and equally within the prohibition of the Constitution." And, again: "It is different with contracts between individuals and a State. In respect to these, by virtue of the 11th Amendment to the Constitution, there being no remedy in a suit against the State, the contract is substantially without sanction, except that which arises out of the honor and good faith of the State itself, and these are not subject to coercion."

In a later case, indeed, the latest I have seen upon this subject, Smith vs. Reeves, 178 U. S. R., the suit was against the Treasurer of the State of California, and the court said: "The relief sought is a judgment against the officer in his *official capacity*, and that judgment would compel him to pay out of the public funds in the Treasury of the State, a certain sum of money. * * * In the present case the action is not to recover specific moneys in the hands of the State Treasurer nor to compel him to perform a plain ministerial duty. It is to enforce the liability of the State to pay a certain

amount of money on account of the payment of taxes alleged to have been wrongfully exacted by the State from the plaintiff." I think, therefore, in all cases of contract between individuals and the State, the true rule seems to be that when a suit against its officers in their official capacity, would require the payment of money out of the State Treasury not specifically set apart or appropriated, or the converse of the proposition, the receipt of money under a contract, the amount of which has not been ascertained, either by legislative enactment or judicial decision, or the refusal to receive which would be a mere breach of contract by the State, is a suit against the State, and within the constitutional prohibition.

For these reasons I have already signed an order sustaining the demurrer and dismissing the complainant's bill.