MARYLAND COMMITTEE FOR FAIR REPRESENTATION, ET AL. *v.* TAWES, GOVERNOR AND BOARD OF STATE CANVASSERS, ET AL.

[No. 52, September Term, 1961.]

416

*Decided April 25, 1962.*

The cause was argued on October 17, 1961, before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ.

The cause was reargued on December 12, 1961, before BRUNE, C. J., HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ., and MACGILL, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Alfred L. Scanlan,* with whom were *Johnson Bowie, Michael Paul Smith, Francis X. Gallagher, David MacDonald* and *John B. Wright* on the brief, for appellants.

*James P. Garland, Assistant Attorney General,* and *Joseph S. Kaufman, Deputy Attorney General,* with whom was *Thomas B. Finan, Attorney General* on the brief, for appel-' lees.

Brief Amicus Curiae filed by League of Women Voters of Maryland. *John I. Heise, Jr.,* and *Charles A. Horsky* on the brief.

PRESCOTT, J., delivered the opinion of the Court.

In its entire history, this Court has seldom, if ever, been called upon to decide a case of greater, or more far-reaching, importance than the case at bar. It involves the composition and proper organization of the State Government itself, and the correlative duties and responsibilities of the coordinate branches thereof. The problem calls for the best efforts of all three branches of the State Government in order to furnish to the people of Maryland, without the uncertainties of an interregnum and its attendant risk of chaos, an orderly and continuous system of self-government that will not violate any of the provisions of the Maryland or Federal Constitutions. It needs no citation of authority to state that if any portion of the system of Maryland's government infringes upon the Federal Constitution, which is the supreme law of our land, it must yield to the provisions of the Federal Constitution. And if it does infringe upon the Federal Constitution, it is also invalid under our own constitution, which provides:

> "The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, * * * are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to

the contrary notwithstanding." Maryland Declaration of Rights, Article 2.

We deem it appropriate, at the outset, to say that the questions involved in this case do not bring on a clash between any two branches of our State Government. We, as members of the Judiciary, are not required to declare any previous action of the Governor or of the Legislature invalid or unlawful. The foundation question posed is whether Section 2 or Section 5 of Article III of the Maryland Constitution, or both (the sections that apportion the members of the General Assembly), in view of the present distribution of population in Maryland, constitute an unreasonable, discriminatory dilution of appellants'[1] rights of suffrage (insofar as the 1962 election is concerned), in violation of the Equal Protection clause of the Fourteenth Amendment of the Federal Constitution, which is, of course, the Supreme Law of the entire United States, and specifically made the Supreme Law of this State by Maryland's Constitution, as pointed out above.

The decision of the Supreme Court of the United States in the recent case of *Baker v. Carr,* 369 U. S. 186, presents problems that must be considered by all three branches of our State Government. There can be no doubt that the decisions of the Supreme Court construing the Federal Constitution and Acts of Congress pursuant thereto are conclusive and binding, not only upon the state courts,[2] but also upon all other branches and departments of the Federal and State Governments. In the *Baker* case, as in the case at bar, citizens, who were eligible voters, sought declaratory and injunctive relief. They challenged the validity of the Tennessee apportionment statute upon the ground that they were being denied "equal protection of the laws" under the Fourteenth Amendment by virtue of a dilution or debasement of their votes. The District Court dismissed the action on the grounds that the Court

---

1. This, of course, refers to the individual appellants. We shall use the word "appellants" hereafter quite often as referring only to those who are persons.

2. This was recognized in this State as early as the decision of the case of Howell v. State, 3 Gill 14.

lacked jurisdiction and the complaint failed to state a claim upon which relief could be granted (there was also an additional ground not here pertinent). The Supreme Court reversed, holding that the subject matter was within the federal judicial powers as defined in Article III, § 2 of the Federal Constitution, and Congress had assigned original jurisdiction thereof to the District Courts by Section 1343 (3) of 28 U. S. C. It further held that a justiciable cause of action had been stated upon which the appellants would be entitled to appropriate relief, and the appellants had standing to challenge the apportionment statute. The Court also noted that it had "no cause at this stage to doubt the District Court will be able to fashion relief if violations of constitutional rights are found." Indeed, Mr. Justice Clark, who preferred that the case be decided upon its merits, suggested, in a concurring opinion, that the District Court do the apportioning. 369 U. S. at page 251. It is our belief that if any action needs to be taken in order to bring the State's system of legislative apportionment into conformity with the requirements of the Fourteenth Amendment and Article 2 of the Maryland Declaration of Rights, it is preferable from the point of view of responsible self-government that the State's own duly constituted officials and the people themselves undertake the task, rather than leave to the Federal judiciary the delicate and perhaps unwelcome task of doing so. We take it under *Baker v. Carr, supra,* that it is clearly a task which the Federal courts would be duty bound to undertake, upon a proper showing of the need therefor.[3] Assuming that the allegations of appellants' bill of complaint are true, this can only be accomplished by action upon the part of the Governor of this State, the Legislature and this Court. We proceed to consider whether this can be lawfully done under our present constitution and laws.

The case reaches this Court upon appeal from a decree of the Circuit Court for Anne Arundel County, as a Court of Equity, which sustained demurrers to appellants' bill of complaint requesting declaratory and injunctive relief,[4] and dismissed the same.

3. More will be said of the Baker case later.
4. We have pointed out in at least three recent cases that de-

420

The bill alleges that the plaintiffs (appellants), with one exception, are residents, taxpayers and eligible voters of the ·counties of Anne Arundel, Baltimore, Prince George's and Montgomery (hereinafter sometimes referred to as the "four suburban counties"), and the City of Baltimore. The other appellant, the Maryland Committee for Fair Representation, is an unincorporated private association composed of taxpayers and eligible voters residing in the aforementioned counties and elsewhere in Maryland.[5] The defendants (appellees) are: the Governor of this State, whose duty it is to issue commissions to candidates elected to office in state elections, in conformity with the statements and determinations made by the Board of State Canvassers and delivered to him by the Secretary of State (Code [1957], Article 33, section 143 [6] [b]) ; the Board of State Canvassers (State Canvassers), whose duty it is to determine and declare, upon the basis of the certified copies of election returns made to them by the city and county canvassers, what persons have been elected to office at any state election, including election to the General Assembly (Section 142 [b]) ; the Secretary of State, who is required to record the certified statement and determinations of election delivered to him by the State Canvassers and to transmit a copy of the determinations to the Governor (Section 143 [a]) ; and

murrers should rarely be sustained in suits for declaratory relief. Shapiro v. County Comm., 219 Md. 298, 302, 149 A. 2d 396; John B. Robeson v. Gardens, 226 Md. 215, 219, 172 A. 2d 529; Reed v. Pres. of North East, 226 Md. 229, 253, 172 A. 2d 536. The rule concerning the same is stated in Shapiro, supra. The instant case illustrates, as will be seen later, some of the reasons therefor. Although there seems to be little dispute as to the facts, the most that we can do, under the present posture of the appeal, is to assume the truth of well-pleaded facts for the purposes of the demurrers alone. Had the actual facts been established, by stipulation or otherwise, much time and expense possibly would have been saved.

5. One of the demurrers challenged the standing of this party, but the chancellor did not decide the question, nor was any argument made thereon in appellees' brief. We, shall, therefore, assume, without deciding, that the Committee is a proper party.

6. All future references will be made to the Code (1957), Article 33, unless otherwise noted.

the Board of Election Supervisors of Anne Arundel County.

The bill further alleges (with the allegations supported by Exhibits) that the 1960 population figures, based on the Federal census taken in 1960, show the present total population of Maryland is 3,072,999. The total combined population of the Counties of Anne Arundel, Baltimore, Montgomery and Prince George's and the City of Baltimore is 2,312,485, which is approximately 76% (percentages hereinafter mentioned are usually approximate ones) of the total 1960 population of the State. The population of the remaining 19 counties is 760,514, or 24% of the total population. Yet, under the representation now provided by Sections 2 and 5 of Article III of the Maryland Constitution, the four suburban counties and the six legislative districts of Baltimore City each have one member in the State Senate for a total of 10 out of 29 who comprise that body, or 34% of the total representation in the State Senate; and the said suburban counties and legislative districts of Baltimore have a total of 60 delegates out of a total of 123, who comprise the House of Delegates, or 49% of the total representation in that House.

Further allegations of the bill assert that the four suburban counties and Baltimore City are the only political subdivisions of the State subjected to under-representation in the General Assembly, and these allegations are supported by plaintiffs' Exhibit D. This Exhibit shows that when the entire population of the State elects 29 senators, each, population-wise, represents some 106,310 persons of that population. None of the counties of Maryland has a population of over 106,310, except the four suburban counties. And, if the composition of the State Senate were based upon the present population alone, the four suburban counties and Baltimore City would be entitled to 22 instead of 10 Senators. The Exhibit shows that in Baltimore County the mean figure of 106,310 persons represents but 22% of its population, and varies upward in the other counties to a peak in Kent County, where the same mean figure represents 692% of its total population.

The Exhibit discloses a like situation with reference to representation in the House of Delegates (based upon 25,065 of population for each Delegate) : all of the suburban counties

and Baltimore City are subjected to under-representation, varying from minus 3% in Baltimore City to minus 225% in Baltimore County, and all of the other counties enjoy over-representation ranging from 23% over-representation in Harford County to 74% in Somerset County. For examples, it shows that each of the four Delegates from Dorchester County represents a figure of 7,399 of population, while each of the six Delegates from Baltimore County represents 81,700 of population; and each of the three Delegates from Talbot County represents 7,173 of population, while each of the six from Prince George's County represents 59,343.

The bill also contains allegations that the four suburban counties and Baltimore City contributed for the fiscal year ending in 1959, 84% of the income tax revenue, 73% of the sales and use tax revenue, 83% of the corporation franchise tax and 70% of the revenue obtained from business licenses; and, although the four suburban counties contain 46% of the total motor vehicle registrations in the State, they received back only 12% of the total allocation to the various political subdivisions of the motor vehicle fuel tax.

The bill further asserts that no legislative relief is available to the appellants, and it points out and specifically names at least eleven bills that were introduced in the General Assembly, during the last ten years, for achieving some reapportionment of or change in the representation now provided in the aforementioned Sections 2 and/or 5 of Article III, and that legislation proposing the call of a constitutional convention was introduced at the 1954, 1955, 1957 and 1960 sessions of the General Assembly. The bill then states that all of these reapportionment proposals and the legislation introduced for the purpose of convening a constitutional convention failed of passage because of the opposition of the members of the General Assembly representing the less populous counties.

The bill also states that under the provisions of Section 2 of Article XIV and Section 9 of Article XVII of the Maryland Constitution a referendum with respect to the question of whether a constitutional convention should be convened was held in the 1950 general election, and the proposal to assemble a convention was approved by a vote of some 200,000 to

70,000, but bills to make the proposal operative introduced at the next session of the General Assembly were tabled.

The complaint further asserts that the appellants are suffering irreparable injury as a consequence of the "illegal discrimination in the exercise and effect of their voting rights and the taxation without adequate representation to which they and all eligible voters" of the four suburban counties and Baltimore City are subjected by virtue of the above mentioned Sections 2 and 5, which sections violate their rights of suffrage guaranteed under the Equal Protection clause.

The prayers, condensed, are:

(1) That the court grant a declaratory judgment holding that Sections 2 and/or 5 of Article III of the Maryland Constitution violate the Fourteenth Amendment of the United States Constitution;

(2) That the court declare that the representation in the General Assembly as now established by said Sections 2 and 5 violates the Civil Rights statutes, *i.e.*, Title 28 U. S. C. 1343 (3) and (4), and Title 42 U. S. C. 1983;

(3) That the court declare that the General Assembly's failure to reapportion its membership in accordance with a formula which reasonably reflects the present population of the different counties and Baltimore City violates the Equal Protection clause and the said Civil Rights statutes, as well as Article 7 of the Maryland Declaration of Rights;

(4) That the court declare the General Assembly's failure to convene a constitutional convention, "as approved in the General Election of 1950," violates Section 2 of Article XIV of the Maryland Constitution as it read in 1950, as well as Articles 1, 7 and 45 of the Declaration of Rights;

(5) That the Court permanently enjoin the Board of State Canvassers and the members thereof, as identified herein, from determining, certifying, or in any other way indicating the Board's approval of the election of any candidate to the General Assembly of Maryland in any State election to be held in November 1962 or thereafter (unless such future State election be held on an at large basis), until such time as the General Assembly of Maryland shall have enacted and submitted for a referendum vote by the eligible voters of this

State, an amendment or amendments to Sections 2 and 5, Article III of the Maryland Constitution, which would reapportion, on the basis of present population and in conformity with Section 1 of the Fourteenth Amendment of the United States Constitution, the representation which is allotted to the various counties and the City of Baltimore in the General Assembly of Maryland; (6) That the Court enjoin defendant Tawes from issuing commissions of elections to any candidates for the General Assembly of Maryland in any State election to be held in November 1962, or thereafter (unless such future election be held on an at large basis), until such time as the General Assembly of Maryland shall have taken the action requested in paragraph (5) of these prayers for relief; (7) That the Court enjoin the Board of Election Supervisors of Anne Arundel County from issuing commissions to any candidates to the General Assembly of Maryland from Anne Arundel County in any state election to be held in November, 1962, or thereafter, unless held on an at large basis, or the General Assembly shall have taken the action requested in prayer (5) above; (8) That the Court retain jurisdiction of the case, require the defendants to pay the costs, and grant such other and further relief as may seem just and proper.

We shall first determine what we consider the subsidiary questions raised by the appellants. In regard to prayer (2), Section 1983 of Title 42 U. S. C. provides, in part, that "every person" who subjects, under color of law, custom, etc., any other person to the deprivation of his constitutional rights, privileges, etc., shall be liable to the party injured. Section 1343 (3) and (4) of Title 28 U. S. C. gives original jurisdiction to the Federal District Courts to redress such deprivations, including equitable relief under any Act of Congress providing for the protection of civil rights. Clearly, Section 1343 (3) and (4) has no application at all, since there is no question pertaining to the jurisdiction of a Federal District Court. Section 1983 of Title 42, U. S. C., though it creates a new liability and affords means for its enforcement and for the enforcement of constitutional and other rights for the protection of which the new cause of action and remedies are given,

does not create the constitutional or other rights for the violation of which it affords a cause of action and remedies. On the allegations of the bill, we are unable to see any "violation" of Section 1983. We conclude that there is no basis for a declaration that either of the sections just referred to is violated by the present Maryland legislative apportionment, even if that apportionment should be found to be invalid under the Fourteenth Amendment.

In view of what we hold below in regard to the other prayers, we deem it unnecessary to consider specifically prayers (3) and (7). The underlying purpose of these prayers and of the whole bill appears to be to obtain relief for the future. Insofar as prayer (3) may seek a declaration as to the past, our comments below on prayer (4) are applicable to it also.

Prayer (4) asks for a mere declaration that the General Assembly's failure to convene a constitutional convention, as the result of an election that occurred more than ten years ago, violates certain of the provisions of our Constitution. It is no more, we think, than a request to answer an abstract question, which, if answered, would serve no useful purpose. Such action is not included among the purposes of declaratory relief, under our statutes. 1 Anderson, *Declaratory Judgments,* §§ 3, 222. The declarations requested in prayers (2) and (4) seem to have been framed with the Federal Declaratory Judgments statute, Title 28 U. S. C. A. § 2201, in mind which, as we read it, seems broader in scope than the Maryland statutes relating to declaratory judgments.

This brings us to the pivotal questions to be determined. It will be noted the Court is requested to declare that Sections 2 and/or 5 of Article III (hereafter referred to as Sections 2 and 5) are unconstitutional, and to enjoin certain of the State's officials from certifying the election of candidates, *at the election to be held in November 1962,* in the absence of some relief from the infringement upon the appellants' asserted constitutional rights. As we view the appellants' contentions here, their entire thrust is directed to the election of 1962, and the future, and we shall so consider it.

If Sections 2 and/or 5 are unconstitutional, whose function, duty and obligation is it to declare them to be so? Section 1

of Article IV of the Maryland Constitution vests the judicial power of the State in the Judiciary, and this encompasses *all* the judicial power of the State. *Magruder v. Swann,* 25 Md. 173. That the Judiciary is the ultimate authority to determine whether constitutional limitations have been transcended is a proposition that has been so long established and frequently applied it can no longer be seriously challenged. Chancellor Kent states that in *Marbury v. Madison,* 1 Cranch 137, "The power and duty of the judiciary to disregard an unconstitutional act of Congress, or of any state legislature, were declared [by Chief Justice Marshall], in an argument approaching to the precision and certainty of a mathematical demonstration." 1 Kent's Commentaries (14th ed.) p. 609. For two of the cases in which this Court decided whether provisions of the Maryland Constitution violated the Federal Constitution, see *Anderson v. Baker,* 23 Md. 531, and *Torcaso v. Watkins,* 223 Md. 49, 162 A. 2d 438, reversed 367 U. S. 488.

But it is suggested that although it is the general rule that courts determine questions of constitutional transgressions, this is not so when "political questions," *i.e.,* questions which, under the Constitution, are to be decided by the people in their sovereign capacity, or in regard to which full discretionary authority has been delegated to the legislative or executive branch of the government, are involved; and that the question now being considered is a political one. We are referred to such cases as *Kidd v. McCanless,* 292 S. W. 2d 40 (Tenn. 1956), and the cases therein cited. It is unquestionably true that the courts will not determine purely political questions, but this *concessum* does not determine whether the question now being considered is a political one. The question would give us considerable concern, and we would discuss it more thoroughly, were it not for the Supreme Court's decision in *Baker v. Carr, supra.* In that case, where the facts and issues involved were quite similar to those in the case at bar, the Court considered, exhaustively, what are, and what are not, "political questions." It specifically considered *Kidd v. McCanless,* affirmed 352 U. S. 920, which was the forerunner of and involved the same statute in, the *Baker* case. No useful purpose would therefore be served if we discuss *Kidd* elaborately. The Court, in *Baker,*

flatly, held that the determination of whether or not a question is political is one for the Court, as the ultimate interpreter of the Constitution. And it stated: "We understand the District Court to have read the cited cases [those cited by the District Court in 179 F. Supp., at 826, which included *Kidd v. McCanless,* 352 U. S. 920] as compelling the conclusion that since the appellants sought to have a legislative apportionment held unconstitutional, their suit presented a 'political question' and was therefore nonjusticiable. We hold that this challenge to an apportionment presents no nonjusticiable 'political question'. *The cited cases* [which as we noted above included *Kidd v. McCanless, supra,* 352 U. S. 920] *do not hold to the contrary."* (Emphasis ours.)

We may add that the Supreme Court of Tennessee in *Kidd v. McCanless, supra,* did not in terms invoke the political question doctrine, but based its refusal of relief on the ground that the declaration sought by the plaintiffs would, under the Tennessee doctrine of *de facto* officers, leave the State without a legislature.

Unfortunately, the term "political question" is more a label indicating a result than a guide as to whether or not a particular question is purely political and so non-justiciable. In *Baker v. Carr, supra,* the Supreme Court's stated holdings (as we noted above) were (a) that the court [the District Court] possessed jurisdiction of the subject matter; (b) that a justiciable cause of action was stated upon which appellants would be entitled to appropriate relief; and (c) that the appellants had standing to challenge the Tennessee apportionment statutes. To arrive at holdings (a) and (b) it was necessary for the Supreme Court to determine only questions of Federal jurisdiction and of justiciability under Federal law. Much of its discussion of prior cases in which the Court had taken the view that the questions therein presented were political, is directed to a showing that many of these cases involved questions the determination of which was committed to one of the other coordinate branches of the Federal Government. A number of these involved the provision of the Federal Constitution guaranteeing a republican form of government to each of the

States. Some few cases involving political questions were described as cases in which problems of relief were controlling, such as *Radford v. Gary,* 352 U. S. 991 (a per curiam affirmance of the dismissal of a suit by a District Court based upon *Colegrove v. Green,* 328 U. S. 549, and *Kidd v. McCanless,* above cited).

There was no need in *Baker v. Carr, supra,* for the Supreme Court to pass upon the power of a State court to deal with questions of State legislative apportionment. Since we are bound by our State Constitution as well as by the Constitution of the United States to give effect to the supremacy of the latter, and since we recognize the decisions of the Supreme Court of the United States as binding interpretations of the Constitution of the United States, it seems to follow that the holding of the Supreme Court in *Baker v. Carr, supra,* that a question such as the one here presented does present a justiciable question under the Federal Constitution, is controlling here. Though under the separation of powers rationale for many of the political question cases cited in the *Baker* case, the courts of this State might be powerless if no Federal constitutional right were involved, the very foundation of the appellants' case is the alleged violation of their rights under the Equal Protection clause of the Fourteenth Amendment to the Federal Constitution (and under Article 2 of our Declaration of Rights).

That such a case as this is appropriate for consideration by a State court is, we think, implicit in the vacation of the judgment and remand by the Supreme Court of the United States to the Supreme Court of Michigan of the case of *Scholle v. Hare,* 369 U. S. 429. This is an apportionment case involving the provision of the Michigan Constitution, as amended in 1952, which froze representation in the State Senate on a geographical basis therein fixed by the amendment. The Michigan Court relied heavily upon *Colegrove v. Green, supra,* in reaching its conclusion (360 Mich. 1, 104 N. W. 2d 63). The jurisdiction and the obligation of State courts to enforce and protect rights created by the Federal Constitution or by Federal statutes is well established, in the absence of any limitation upon State action by Federal statute or by the nature of the

right, provided the subject matter is within the general jurisdiction of the State court in which the right is sought to be enforced. *Claflin v. Houseman,* 93 U. S. 130; *Robb v. Connolly,* 111 U. S. 624, 637; *Mondou v. New York, N. H. & H. R. Co.,* 223 U. S. 1; *Mooney v. Holohan,* 294 U. S. 103; *United States v. Bank of New York & Trust Co.,* 296 U. S. 463, 479; *Testa v. Katt,* 330 U. S. 386, 392; *Irvin v. Dowd,* 359 U. S. 394. The question here would seem to come down to whether there is anything in the Constitution or laws of Maryland to prevent this Court from acting in this case.

In a number of cases in other States there have been provisions in the constitutions of those States calling for reapportionment by legislative action. Authority to initiate legislation to conform to such a constitutional requirement is not vested in the courts of those States, yet in a number of instances, courts have acted in such cases and have not considered themselves barred from doing so by the political question doctrine. Here, it is alleged that apportionment provisions of our State Constitution impinge upon rights under the Federal Constitution, which are expressly made superior to any conflicting provisions of the State Constitution. If these allegations are well founded, the invalidity of our apportionment provisions is no less than if we had a constitutional requirement for periodic reapportionment by the Legislature on a basis of population and the Legislature had failed to carry out the mandate. The duty of our courts to determine the validity of provisions of the State Constitution in the light of the Federal Constitution is, as we have already noted, well established. As Mr. Justice Brennan pointed out in the *Baker* case, citing *Nixon v. Herndon,* 273 U. S. 536, "the mere fact that the suit seeks protection of a political right does not mean it presents a political question." 369 U. S. 209.

The Supreme Court of our nearby, sister State of New Jersey had a very similar situation to the one at bar presented to it in 1960. Citizens, who were taxpayers, brought an action seeking a declaration that the 1941 New Jersey apportionment law then in effect had been rendered unconstitutional by

the 1950 census. The Court held that the Judiciary of that State had the solemn duty to interpret laws in the last resort, and, however, delicate that duty may. be, the courts can not surrender, ignore, or waive it, adding that the authority and duty to act when the Court's jurisdiction is invoked in such cases, in the words of Chief Justice Beasley in *State v. Rogers,* 28 A. 726, 757 (N. J.), is " 'so entirely established as not to be debatable.' " There as in the instant case, the argument was made that if the apportionment act were declared unconstitutional, it would create chaos and break down the framework of the State Government. The Court answered that argument in this manner:

"There is no doubt, as we have stated, that it is within the competence of the Judiciary to adjudge a reapportionment act violative of the Constitution. Some of the defendants suggest that to do so would be to create chaos or anarchy, because no matter how long the filing of our mandate was withheld to permit the enactment of a curative law, the state government would be completely disrupted if the Legislature did not act within that time. Although we agree that if the 1941 act has become unconstitutional, resort could not be had to an apportionment act of an earlier vintage because any such measure would also be invalid by the same test, we do not believe that the allegedly feared result would ever come about. A judiciary, conscious of the sacrosanct quality of its oath of office to uphold the Constitution, cannot accept an *in terrorem* argument based upon the notion that members of a coequal part of the government will not be just as respectful and regardful of the obligations imposed by their similar oath. Any less faith on our part would be an unbecoming and unwarranted reflection on the Legislature.

"Concrete examples of justification for such faith are available. The two State v. Cunningham cases, supra, [State ex rel. Lamb v. Cunningham, 83 Wisc. 90, 53 N. W. 35; State v. Cunningham, 81 Wisc. 440,

51 N. W. 724.] reveal that on March 22, 1892, the Supreme Court of Wisconsin declared the existing apportionment act invalid. On July 2, 1892 a special legislative session passed a new act. It, too, was invalidated by the same court on October 7, 1892, but ten days later, at a second special session, another reapportionment was adopted, and that act validated the notices of election previously issued by the Secretary of State for the November 8, 1892, election."

The Court decided it would make no declaration at that time, but it would retain jurisdiction in order to afford the New Jersey Legislature time to consider the adoption of a constitutional reapportionment statute. *Asbury Park Press, Inc. v. Woolley,* 161 A. 2d 705, 712, 716. The New Jersey Legislature met, and, in accordance with its duty, enacted a reapportionment bill.

Also, in *Magraw v. Donovan,* 163 F. Supp. 184, a three-judge District Court considered, in 1958, the constitutionality of Minnesota's apportionment statute. The Court assumed jurisdiction, stated that, "[i]t is not to be presumed that the Legislature will refuse * * * to comply with its duty under the State Constitution," and that "* * * if there [were] to be a judicial disruption of the [then] present legislative apportionment * * *, it should not take place unless and until it [could] be shown that the Legislature * * * [at its next meeting] advisedly and deliberately failed and refused to perform its constitutional duty to redistrict the State." The Court then deferred decision in order to afford the Legislature full opportunity to " 'heed the constitutional mandate to redistrict,' " but retained jurisdiction with leave to any of the parties, within 60 days after the adjournment of the next session of Minnesota's Legislature, to petition the Court for such action as they deem appropriate. Thereafter, the Minnesota Legislature, in accordance with its duty, enacted a reapportionment bill, and the action was dismissed.

In *Jones v. Freeman,* 146 P. 2d 564, 570, the Supreme Court of Oklahoma stated: "It might be well to point out that in 1938, the courts of twenty-two states had exercised the power,

or had stated that they had the power, to review legislative apportionment acts upon constitutional grounds * * *." See also the Annotation in 2 A.L.R. 1337, and Lewis, *Legislative Apportionment*, 71 Harv. L. Rev. 1057, 1066-1070.

Section 2 provides, *inter alia*, that one State Senator shall be elected from each county and each of the six legislative districts of Baltimore City, by the qualified voters of their respective counties and legislative districts, and they shall serve for four years from the date of their election.

Section 5 states that the membership of the House of Delegates shall consist of 123 members, and apportions them among the counties and the legislative districts of Baltimore City.

There is no provision of the Maryland Constitution that expressly provides for reapportioning of the representation in the General Assembly.[6a] Article XIV, Section I provides for amendments to the Constitution generally. It states, in substance, that the General Assembly may propose amendments, and if passed by three-fifths of all the members elected to each of the Houses, they shall be submitted to the qualified voters of the State for adoption or rejection; and, if it shall appear to the Governor that a majority of the votes cast at said election were cast in favor of the amendments, the Governor shall proclaim said amendments to have been adopted by the people. Section 2 of said Article XIV provides, again in substance, that the General Assembly shall provide by law for taking, at the general election in 1970, and every twenty years thereafter, the sense of the people in regard to the calling of a constitutional convention and if a convention be assembled each county and legislative district shall be entitled to a number of Delegates thereto equal to its total representation in both Houses at the time of the convention. Thus, it is seen that if the allegations of the bill of complaint are true, and we must assume them to be true for the purposes of the demurrer, the chances of the appellants' obtaining relief from

---

6a. Section 4 of Article III provides for altering the boundaries of the legislative districts in Baltimore City to provide approximately equal population in said districts.

the infringement upon their alleged constitutional rights, other than from the courts, is so remote as to be practically nil.

From what we have said above, we hold that the question now under consideration is not a political one, but one that it is our duty to determine.

We now arrive at a point where it is proper for us to decide whether the well-pleaded allegations of the bill of complaint, which, as stated above, are admitted for the purposes of the demurrer, are sufficient to show that appellants' constitutional rights of suffrage are being impaired by what they term "the deliberate, discriminatory and gross dilution of [their] rights of suffrage which has prevailed in Maryland since 1867, and grows worse with each passing year." We could write page after page on the cherished rights of citizens to enjoy free and reasonably equal suffrage, disfranchisement through gross malapportionment and its adverse consequences,[7] and the vigorous criticisms of malapportionment by legal commentators,[8] representatives of the press,[9] and public officials, but, if we did so, it would only be a repetition of what has been said time and time again, and practically all, if not all, of which was considered by the Supreme Court, the ultimate interpreter of the Federal Constitution, in the case of *Baker v. Carr, supra.* We think the answer to our present question, in the main part, is contained in the decision in that case.

We do not think it possible (or advisable if it were possible) to state a precise, inflexible and intractable formula for constitutional representation in the General Assembly. The determination in each case must depend upon the facts exist-

---

7. See for example: Commission on Intergovernmental Relations, A Report to the President, 38-40 (1955); Douglas, Unequal Voting: A Challenge to Democracy, 1 Labor's Economic Review, 88, 89; Baker, Rural v. Urban Political Power, 27, 28; Walter, Reapportionment and Urban Representation, 195 Annals 11, 12.

8. Lewis, Legislative Apportionment and the Federal Courts, 71 Harv. L. Rev. 1057; Tabor, The Gerrymandering of State and Federal Legislative Districts, 16 Md. L. Rev. 277; 17 Law & Contemp. Prob. 253-469.

9. Strout, the Next Election is Already Rigged, Harper's Magazine, November, 1959; The Wall Street Journal, October 17, 1960, p. 1.

ent at the time it is decided. In Maryland, there is no requirement, constitutional or otherwise, that such representation be based upon a mathematical ratio of population, or of eligible voters, and we do not intimate such a ratio is necessary to meet constitutional requirements. However, even though the Tennessee Constitution specifically provided that representation in the General Assembly should be apportioned among the counties or districts "according to the number of qualified voters in each," there is a strong implication in the *Baker* decision that there must be some reasonable relationship of population, or eligible voters, to representation in the General Assembly, if an apportionment is to escape the label of constitutionally-prohibited invidious discrimination. The State is, of course, to be allowed every reasonable latitude in such relationship, and any discrimination therein "will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland*, 366 U. S. 420, 426 (1961). Cf. *Williamson v. Lee Optical of Oklahoma*, 348 U. S. 483, 489. The representation in the State Senate of Maryland has traditionally been based more upon area and geographical location (one from each county and each legislative district of Baltimore City) than upon the relationship of population, or eligible voters; hence, a greater latitude may be permissible in the relationship of population, or eligible voters, in the State Senate than in the House of Delegates, or possibly some different basis of apportionment of seats might be permissible.[10] Such a question may be presented in the *Scholle* case.

History,[11] also, has been recognized as a pertinent consid-

---

10. The apparent analogy between the political subdivisions of the State and the States of the Union, insofar as legislative representation is concerned is not close, though it is not to be overlooked entirely. It is, perhaps, more relevant since the adoption of the Seventeenth Amendment, which provides for the popular election of Senators, than it was before; but the difference between a mere political subdivision of a State and a State retaining attributes of sovereignty remains very substantial.

11. Historically, a distinction has been made between the two houses in this State ever since the Constitution of 1776. Under it, each county was entitled to four delegates, and the City of

eration in the making of a constitutional determination (*Frank v. Maryland,* 359 U. S. 360) ; and geography has also been recognized as worthy of some consideration through the protection which it may afford to some segments of the population in matters of electoral concern. *MacDougall v. Green,* 335

---

Annapolis (a part of Anne Arundel County) was entitled to elect two and Baltimore Town (then a part of Baltimore County) was also entitled to elect two (unless its population should decline). The Senate was selected by electors chosen two per county and one each from Annapolis and Baltimore who then elected six senators from the Eastern Shore and nine from the Western Shore. Under the Constitution of 1851, each county and the City of Baltimore was entitled to elect one senator, but representation in the House of Delegates was to be generally in proportion to population after the census of 1860, with an initial apportionment varying from two to six members for the several counties. No county was to have less than two delegates and Baltimore City was always to have four more delegates than the most populous county. Reapportionment was to be made after each national decennial census, and the number of members of the House was to be not less than 65 nor more than 80. Under the Constitution of 1864, each county and each of the three legislative districts in the City of Baltimore was to elect one senator. Representation in the House of Delegates was to be apportioned on the basis of the white population. Each county was to be entitled to one delegate for each 5,000 persons or fractional portion over one-half thereof up to five delegates, to one additional delegate for the next 20,000 persons or fractional portion over one-half thereof, and above that number to one delegate for every 80,000 persons, or fractional portion thereof above one-half. Reapportionments were to be made after each national census. An initial apportionment was made of from 2 to 6 members per county or legislative district. The Constitution of 1867 continued the provision for one senator from each county and from each of the three legislative districts into which the City of Baltimore was divided. The House was to consist initially of from two to six members from the several counties and of six from each legislative district of Baltimore. This was to continue until the next national or state census, after which representation was to be as follows: 2 delegates for any county of less than 18,000 population; 3 for each county between 18,000 and 28,000; 4 for each county from 28,000 to 40,000; 5 for each county from 40,000 to 55,000; and 6 but no more, for each county with more than 55,000 population. Each Baltimore legislative district was to have as many delegates as the most populous county. Reapportionment was to be made by procla-

U. S. 281. What effect such considerations may have in the light of the remand of the *Scholle* case and of whatever may be its ultimate disposition, is something which we cannot now determine; nor would the present posture of the case make it appropriate for us to express any definitive opinion with regard to these matters.

The well-pleaded allegations of the bill of complaint, as we have noted above, state that 24% of Maryland's population elect 66% of the State Senators and 51% of the members of her House of Delegates, and, in the present posture of the case, inquiry into the rational basis for such apportionment seems to be called for. We, therefore, hold that the demurrers should have been overruled, and the chancellor should now receive evidence to determine whether or not an invidious discrimination does exist with respect to representation in either or both houses.

We turn now to the proper relief to be granted, if Sections 2 and/or 5 are determined to be unconstitutional. It is suggested that they should not be declared unconstitutional as to the November election of 1962, because this action would be adjudicating future rights. The courts, ordinarily, will not decide future rights in a declaratory action, but "where the declaration of future rights is bound up with a present necessity of a declaration of the same, and these present rights depend upon such a declaration, then the reason for refusal to grant declaratory relief disappears." 1 Anderson, *op. cit.*, § 231. In the same section, the learned author states the same principle thus:

---

mation of the Governor after each national or any state census. This system continued in force with changes in 1900 to four legislative districts in Baltimore, and in 1922 to six, until 1950, when to check the increasing power of small counties whose representation might still increase long after more populous units had attained their maximums of six each, the membership of the House was frozen at its then total and at the fixed apportionment of members among the State's political subdivisions as it then was—that is, on the basis of the 1940 census. These provisions were continued without substantial change in the 1956 revision of the Constitution, which did not undertake to make substantial changes. (No attempt has been made to include all of the Amendments to the Constitution relating to past apportionments of membership.)

"After all, however, it should not be overlooked
that the true purpose or mission of the Declaratory
Judgment Act is to guide parties in their future con-
duct to avoid useless litigation. If an actual contro-
versy exists and that controversy is of a justiciable
character necessary to meet the demands of the act,
the remedy may, and should be invoked, and where
it appears clearly that the effect of the determination
of the issues raised by a decision in a declaratory ac-
tion will be to avoid much useless expense and bur-
densome litigation, and it is clear, likewise, that an
actual controversy exists, then the remedy is proper,
even though it is granted for future use."

See also *Heald v. Heald,* 56 Md. 300; *Devecmon v. Shaw,* 70
Md. 219, 16 A. 645; *Fleishman v. Bregel,* 174 Md. 87, 92, 197
A. 593; Borchard, *Declaratory Judgments* (1st ed.), §§ 339,
340, 542, 543; and compare *Pennington v. Pennington,* 70
Md. 418, 17 A. 329. The facts of the instant case bring it with-
in the principles laid down in the above authorities, and the
desirability of making a declaration now relative to Sections
2 and 5 as to the November 1962, election is, we think, obvi-
ous.

If the chancellor should find and accordingly declare that
Sections 2 and/or 5 of Article III of the Constitution of Mary-
land and all of the previous provisions of the original Con-
stitution of 1867, and amendments thereto,[12] relating to the

---

12. A reading of the provisions of the original Constitution of 1867
relating to the apportionment of membership in the General As-
sembly, and all amendments thereto, culminating in the present
Sections 2 and 5, show that they are in little, if any, better posi-
tions to meet the required tests than the sections as they are now
constituted. Consequently, if we assume without deciding, that if,
and when, the present Sections 2 and/or 5 are declared uncon-
stitutional, the former sections would, ordinarily, become opera-
tive, they will not do so, because they, too, would be unconsti-
tutional. Cf. Scholle v. Hare, 104 N. W. 2d 63, 125 (concurring opin-
ion).

apportionment of membership (and only to such apportionment) in the General Assembly, insofar as they apply to the General Election of November, 1962, violate the Equal Protection clause of the Fourteenth Amendment of the Constitution of the United States (and are, therefore, also inconsistent with Article 2 of the Declaration of Rights), it would declare that Sections 2 and/or 5 are null, void and of no effect in regard to said election.[13] The court's declaration should make it clear that the tenure and terms of the present members of the General Assembly are, in no way, affected by such declaration. They have been elected and have qualified as members of the General Assembly, and they are entitled to serve their full terms. Article III, Section 19, and Article XVII, Sections 1 and 3, Constitution of Maryland.

The possibility that an adjudication of the invalidity of Section 2 or Section 5, or both, of Article III might create a total or partial legislative hiatus after the election of 1962, leads us to express some views with regard to procedures which might render action of an equity court going beyond mere declaratory relief unnecessary or inappropriate.

There is no provision in the Constitution or election laws of this State that permits an "at large" election of the members of the General Assembly, as suggested by the appellants. Article III, Section 6, of the Constitution provides that Delegates to the House shall be elected by the qualified voters of the counties, or legislative districts, which said Delegates represent.

If the Court should declare that Sections 2 and/or 5 are invalid as to the November, 1962, election, it should also declare that the Legislature has the power, if called into Special Session by the Governor and such action be deemed appropriate by it, to enact a bill reapportioning its membership for

---

13. It should be noted that the court is not requested to declare these Sections invalid as of any particular time, but only prospectively as they affect the November, 1962, election. The theory being that, due to the increase and redistribution of population in the State, somewhere along the line they became unconstitutional, and certainly so in reference to the above mentioned election.

purposes of the November, 1962, election. With Sections 2 and/or 5 no longer a part of the Constitution with reference to said election, this necessarily follows, because the powers of the General Assembly of Maryland are plenary, except as limited by constitutional provisions. *McMullen v. Shepherd,* 133 Md. 157, 104 A. 424; *Brawner v. Supervisors,* 141 Md. 586, 119 A. 250; *Hennegan v. Geartner,* 186 Md. 551, 47 A. 2d 393. For other Maryland cases to the same effect, see 5 M. L. E., *Constitutional Law,* § 81. Such a bill might include any provisions relating to the primary elections or to nominations for the general election which might be necessary to effectuate the provisions of the bill. See *Hennegan,* just cited.

A reapportionment Act might take the form of an actual increase or decrease in the number of seats in either or both houses of the General Assembly apportioned to the several political subdivisions of the State, or might adjust the number of votes or the fractional votes to be cast by the members so as to achieve the same relative voting strength as if an actual reapportionment of membership (with each member having one vote) were made. If a reapportionment bill be passed as an Emergency Act, the latter course (leaving the membership in both Houses, numerically, as it now is), probably, would avoid a conflict with Article XVI, Section 2, which prohibits an Emergency Measure from creating or abolishing any office.

In the circumstances above assumed, namely, that Sections 2 and/or 5 are declared invalid, the decree might also declare that the General Assembly would be empowered to propose a constitutional amendment providing for reapportionment. This presumably would accomplish the same result proportionately between the different subdivisions of the State as that provided for in any reapportionment Act adopted for the 1962 election, and it might include provisions for future reapportionment designed to avoid a recurrence of the present problem. Since it has been traditional in this State to have the matter of representation in the General Assembly expressly regulated by the State Constitution, it might be thought desirable to draft any Act dealing with the 1962 election as a stop-gap measure, and to provide in any Constitutional

Amendment that might be proposed a provision confirming and continuing in force the provisions of such an Act after the adoption of the proposed Constitutional Amendment and until the election to be held in 1966.

Of course, the courts cannot direct the Governor to call the General Assembly into extraordinary session; that is a power the exercise of which lies entirely within his discretion. Nor can they compel the General Assembly to enact a reapportionment bill. These are powers that the courts neither possess, nor profess. But, the courts do have the power and authority to restrain the potency of actions of the coordinate branches of the government (except in regard to purely "political questions") when they transcend constitutional limits. *Watkins v. Watkins,* 2 Md. 341; *Planning Commission v. Randall,* 209 Md. 18, 26, 120 A. 2d 195. And the courts may require, by mandamus, the performance by executive officers of ministerial duties, and also enjoin them in the performance of such duties. *Magruder v. Swann,* 25 Md. 173; *Brooke v. Widdicombe,* 39 Md. 386; *Soper v. Jones,* 171 Md. 643, 187 A. 833. The issuance of commissions by the Governor to those elected to office has been held by this Court to be ministerial in nature. *Magruder v. Swann; Brooke v. Widdicombe,* both *supra.*

If the Governor sees fit to call a Special Session of the General Assembly and the General Assembly deems it proper to enact a bill that apportions its membership so as to meet constitutional requirements, the chancellor would be unwarranted in granting injunctive relief. He should, therefore, not enjoin anyone at this time, but he should retain jurisdiction, so that proper injunctive relief can be granted before the November, 1962, election, should the situation at that time call for the same.

With this disposition of the case, it becomes unnecessary to discuss appellants' arguments concerning alleged violations of the Due Process clause.

The appellees, who were defendants below, have taken no action that would make it proper to award costs against them in this suit.

Because of the urgency of the case, we think that our mandate should issue forthwith, and it will be so ordered.

> *Decree dismissing appellants' bill of complaint reversed, and cause remanded for further proceedings in conformity with this opinion; appellants to pay the costs; the mandate of this court to issue forthwith.*

HENDERSON, J., filed the following dissenting opinion, in which HORNEY, J., concurred.

In *Baker v. Carr,* 369 U. S. 186, the factual situation was different from that in the instant case. The Tennessee constitution fixed the maximum number of State Senators and Representatives, and called for a census of qualified voters every ten years and a reapportionment among the several counties and districts in accordance with such enumerations. In adopting the latest reapportionment Act in 1901, the Tennessee General Assembly chose to rely upon the Federal Census, and departed widely from the constitutional standard of apportionment. Since that date all legislative proposals for reapportionment failed of passage. Meanwhile there was a substantial growth and redistribution of population, causing a considerable disparity in the ratio of representation to population as between the various counties and districts, and a consequent dilution of the voting strength of the complainants.

In Maryland, the Constitution itself fixes the exact number of State Senators and Delegates and the counties and districts from which they are each elected. There is no provision in the Maryland Constitution or law that calls for reapportionment. Representation in the Senate has always been based on geographical considerations, and never on population. In 1776 the Senate was composed of fifteen Senators, nine from the Western Shore and six from the Eastern Shore. In 1851, each county and the City of Baltimore became entitled to one Senator. The Convention probably followed the pattern of the United States Senate, composed of two

442

senators from each state. In 1864, Baltimore City was divided into three districts, and by constitutional amendment in 1922, it became entitled to six. That is the present arrangement; one Senator from each county and one each from the six districts of Baltimore City. See Md. Const., Art. III, sec. 2.

In the House of Delegates, population did not become a factor until 1851. In 1864 and again in 1867, a sliding scale was adopted fixing the representation by numbers ranging from two to six. See Md. Const., Art. III, sec. 5. In 1922, Baltimore City became entitled to 36 Delegates, six from each district. Due to recent shifts in population Baltimore City's representation is now almost at par. The four metropolitan counties have suffered. In 1950, a constitutional amendment, last ratified in 1956, froze the representation on a basis cal-calculated to some extent upon the figures of the Federal Census of 1940. This prevented the small counties from gaining increased representation as their population grew, at the expense of the larger counties and the legislative districts of Baltimore City, whose representation had long since reached the maximum and been frozen at six delegates. The complaint in the instant case is not that the Legislature has failed to obey any constitutional or statutory mandate, but that since 1956 it has repeatedly failed to enact proposals for constitutional amendments to set up a legislative body giving more weight to population than to geography as prescribed in the present Constitution. The crucial question in this case is whether Maryland courts can or should attempt to redress the alleged wrong.

*Baker v. Carr, supra,* was a civil action brought in the Federal District Court under 42 U. S. C. §§ 1983 and 1988, to redress an alleged deprivation of Federal rights. It sought a declaration that the 1901 Act of Tennessee was unconstitutional, and an injunction restraining the State Board of Election Supervisors from certifying any further elections under it.[1] It further prayed that unless and until the General Assembly should enact a valid reapportionment, the District Court

---

1. One point left open in *Baker* was whether the local Boards of Election were indispensable parties.

should either decree a reapportionment by mathematical application of the Tennessee constitutional formulae, or direct the appellees to conduct legislative elections, primary and general, at large. In reversing the three-judge Federal court and remanding the case to the District Court, a plurality of the Supreme Court held that the right asserted was within the reach of judicial protection in the Federal courts under the Fourteenth Amendment.[2] But there was no suggestion as to how the District Court should proceed. It would appear that the selection of a remedy was left to the ingenuity of the District Court, if and when it should find that the allegations of the bill were supported by proof of an invidious, and an otherwise irremediable, discrimination.

If we assume that no valid justification for the present allocation of representation in Maryland can be made, and that no remedial constitutional amendment can pass the Legislature,[3] and relief by the calling of a Constitutional Convention is likewise unavailing,[4] the instant case would seem to fall within the ambit of *Baker v. Carr, supra*. But there are points of distinction. If the Tennessee Act of 1901 were stricken down, and the Legislature were recalcitrant, it is conceivable that the District Court might there order an election to be held and the votes tallied in accordance with the mathematical formulae set out in the Tennessee Constitution. At least, the Court would not have to invent formulae for the purpose. On the other hand, if the provisions of the Maryland Constitution were stricken down there would remain no guide, standard or constitutional means whereby a legislative body could be

---

**2.** It is a somewhat ironic thought that if the Supreme Court had not declined to examine the evidence, on the ground that it was a political question, it would probably have been compelled to hold that the Fourteenth Amendment itself was never validly adopted. See *Coleman v. Miller,* 307 U. S. 433, 450.

**3.** A bill designed to that end failed of passage by only two votes in the recent Legislative session.

**4.** The Attorney General argues that the failure to call a Constitutional Convention after the election of 1950 was not due to the recalcitrance of the Legislature or any other State official, but because there was not the requisite number of votes to meet the requirements of the Maryland Constitution, Art. XIV, sec. 2.

constituted. Even if the Legislature should then meet and adopt a Constitutional amendment, grave doubts would arise as to their authority to act, even if all of their prior acts were not put in question. The gravity of this situation has impressed other courts, see *Kidd v. McCanless,* 292 S. W. 2d 40 (Tenn.) (appeal dismissed 352 U. S. 920), *State v. Zimmerman,* 23 N. W. 2d 610 (Wis.) and *Butcher v. Rice,* 153 A. 2d 869 (Pa.), and led them to decline to intervene. There would also be a serious time lag before the people could vote upon the proposal and new elections could be held under an amendment so adopted.[5]

I believe it is a basic tenet of the common law, to which the inhabitants of Maryland are entitled under Art. 5 of the Declaration of Rights, that judges do not make law but discover it. Thus, if a novel point is decided, or an erroneous decision is overruled in those rare instances that are permissible under the rule of *stare decisis* to which this Court adheres, the decision relates back to the beginning. Likewise, a decision construing a constitutional provision or statute relates back to the date of its adoption or enactment. It is for this reason that courts seek to find the popular or legislative intention contemporaneous to the adoption or enactment. It would seem to follow that a present declaration and construction of the Fourteenth Amendment would necessarily relate back to the time of its adoption, and not merely speak from the date of the declaration. In any event, it would seem that once a declaration is made, no court can suspend the operation and effect of the decision to a later date. Quite apart from the doctrine of relation back, an adjudication that the present Legislature is unconstitutionally constituted would destroy its power to enact even a proposed amendment to the Maryland Constitution.

In *Griffin v. Illinois,* 351 U. S. 12, Mr. Justice Frankfurter, in a concurring opinion, suggested that the decision in that case might be applied prospectively, like a legislative enactment, but apparently the suggestion was not approved by any other member of the Supreme Court. In the New Jersey case,

---

5. It should be noted that the members of the Legislature are elected for four years in Maryland, Art. III, sec. 6.

cited by the majority in the instant case, apparently the Supreme Court of that State made no declaration but merely retained jurisdiction with the clear intimation that, unless the Legislature should act before a dead line, which it fixed, a declaration would be made. I know of no Maryland precedent for such action.

The statement in the majority opinion in the instant case, that if the provisions of the Maryland Constitution, Art. III, secs. 2 and 5, were stricken down, in whole or in part, the Legislature would possess the power to remedy the situation, I think is gratuitous and unsupportable. The point is not properly before us under Maryland Rule 885, since it was not raised below, and was never mentioned in the arguments in this Court. See also *Comptroller v. Aerial Products,* 210 Md. 627, and *Rose v. Paape,* 221 Md. 369. In any event, the matter of how the Legislature shall be selected has always been regulated in Maryland by the Constitution itself. To my mind, no doctrine of plenary or inherent powers can take away a right to deal with a subject matter expressly reserved to the people of this State, and vest it in a legislative body. Cf. *Bennett v. Jackson,* 116 N. E. 921 (Ind.).

The opinion of a majority of the Court in the instant case goes even further. It directs the chancellor, upon proof of the allegations of the bill, to make a declaration striking down the provisions of one or more sections of the Constitution, but at the same time to defer the effectiveness of the declaration until after the expiration of the terms of office of the present members. I cannot understand how that can be done. But if it can, I cannot see how those members could enact legislation reapportioning and reconstituting the General Assembly in the teeth of constitutional provisions that are still in force and effect. Yet this is required, in addition to the passage of a constitutional amendment, as a condition precedent to the validity of the 1962 elections. The opinion further directs that a clause ratifying the proposed legislative reapportionment be included in the proposed constitutional amendment. It seems to me that this is an advisory opinion to a coordinate branch of the Government which is not a party to the suit, and a declaration *in terrorem.*

I find nothing in the Maryland law to support the proposition that reapportionment is a subject fit for judicial determination or action. In Art. III, sec. 19, of the Maryland Constitution it is provided that "each House shall be the judge of the qualifications and elections of its members, as prescribed by the Constitution and Laws of the State * * *." This is in line with Art. 8 of the Declaration of Rights concerning the separation of powers. This Court cannot require the legislature to take action within the scope of its prerogative, by mandamus or otherwise. *Planning Commission v. Randall,* 209 Md. 18, 24; *Connor v. Board of Supervisors,* 212 Md. 379, 385; *Watkins v. Watkins,* 2 Md. 341. Cf. *Fergus v. Marks,* 152 N. E. 557 (Ill.). Of course, courts cannot compel the people to adopt a new Constitution. Under Art. I of the Declaration of Rights the people have "at all times the inalienable right to alter, reform or abolish the form of Government in such manner as they may deem expedient." On the other hand the Legislature itself cannot impose non-judicial duties upon the courts of this State. *Cromwell v. Jackson,* 188 Md. 8, 28, and cases cited. The rule of judicial abstention is wider than the doctrine of separation of powers. The English and colonial precedents cited by Mr. Justice Frankfurter in his dissenting opinion in *Baker v. Carr* denied judicial relief, even before the doctrine of separation of powers was enunciated. The rule of judicial abstention is sometimes based on a lack of jurisdiction, sometimes on judicial policy.

A declaratory judgment itself is not mandatory, but is limited to occasions where a declaration will serve a useful purpose or terminate controversy. *Givner v. Cohen,* 208 Md. 23, 37. Constitutional questions are not to be dealt with abstractly. *Liberto v. State's Attorney,* 223 Md. 356, 360. We have repeatedly held that this Court cannot render advisory opinions. *Hammond v. Lancaster,* 194 Md. 462, 471. Whether this court is prevented from deciding moot cases by a lack of jurisdiction or a rule of decision is beside the point.[6] There is little dispute as to the end result.

The prayer in the bill wherein it is implied that, as an al-

---

6. See *Lloyd v. Supervisors of Elections,* 206 Md. 36, 43.

ternative, elections at large should be decreed by the court and enforced through the agency of the Board of State Canvassers, set up by Code (1957), Art. 33, sec. 142, seems to me to be untenable. It has been held that the Board acts in a ministerial capacity only. *Bowling v. Weakley*, 181 Md. 496. Clearly, the Board has no statutory authority to reapportion. Moreover, Art. III, sec. 9 of the Maryland Constitution specifically requires that Senator and Delegate reside in the county or legislative district which he may be chosen to represent. It has been held that courts may order an election at large for members of the Federal House of Representatives. See *Brown v. Saunders*, 166 S. E. 105 (Va.), and *Smiley v. Holm*, 285 U. S. 355. But those cases turn on the fact that the Federal Constitution, Art. I, sec. 4, expressly confers upon Congress a power to legislate on the subject and that Congress has enacted legislation providing, in effect, that if the States fail to reapportion so as to equalize votes in Congressional elections according to the constitutional standard, elections shall be at large.[7] There is no equivalent provision as to the members of State legislatures. Cf. *Shriver v. Gray*, 276 F. 2d 568 (C. A. 5th). Congress has no constitutional power to legislate on the subject, except interstitially, as in the Federal statutes upon which *Baker v. Carr, supra,* was based.

The appellants argue that even if we lack the power to enforce a declaration, it would serve a useful purpose. I venture to disagree. I think it is not within the realm of judicial propriety to issue a declaration *in terrorem*. In the words of Mr. Justice Clark this would amount to "blackjacking the Assembly." Mr. Justice Frankfurter, in his dissenting opinion (p. 62, Footnote 151) said: "Appellants' suggestion that, although no relief may need be given, jurisdiction ought to be retained as a 'spur' to legislative action does not merit discussion." The suggestion was not discussed by any other of the members of the Court, in *Baker v. Carr, supra.* I assume, therefore, that the decision was predicated upon a finding that the Federal District Court possessed the authority to make a declaration effective, although the means was left to future determination.

---

7. See 2 U. S. C. § 4.

448

The argument that convinces a majority of this Court seems to be that because we are obliged to follow the interpretation of the Federal Constitution by the Supreme Court as the Supreme law of the land, we must take some action. It is true that this Court is as firmly bound by the decisions of the Supreme Court as are the Federal courts. But I venture to doubt that the Supreme Court can confer jurisdiction upon the State courts, even to enforce the Federal Constitution, if they possess no such power under the Constitution and laws of this State. Cf. *Niemotko v. State,* 194 Md. 247. In any event, I think the Supreme Court, in *Baker,* did not purport to deal with the authority of State courts at all. Nor do I think the remand of the case of *Scholle v. Hare,* 369 U. S. 429, forecloses the matter. The remand was for the purpose of allowing the Michigan court to give further consideration to the question presented in the light of *Baker v. Carr.* As I understand it, this was not an adjudication that the State court was not free to adopt its own view of the availability of a State remedy.

In *Baker,* the Supreme Court held that in an extreme case of disproportion in voting strength the Federal courts can and should "fashion" a judicial remedy. It did not hold that there must be a State remedy. On the contrary, in the opinion of the court, delivered by Mr. Justice Brennan, he said (pp. 235-237 of 369 U. S.): "* * * in *Kidd v. McCanless,* 200 Tenn. 273, 292 S. W. 2d 40, the Supreme Court of Tennessee held that it could not invalidate the very statute at issue in the case at bar, but its holding rested on its state law of remedies, i. e., the state view of *de facto* officers, and not on any view that the norm for legislative apportionment in Tennessee is not numbers of qualified voters resident in the several counties. Of course this Court was there precluded by the adequate state ground, and in dismissing the appeal, 352 U. S. 920, we cited *Anderson, supra,* [343 U. S. 912] as well as *Colegrove* [328 U. S. 549]. Nor does the Tennessee court's decision in that case bear upon this, for just as in *Smith v. Holm,* 220 Minn. 486, 19 N. W. 2d 914, and *Magraw v. Donovan,* 163 F. Supp. 184, 177 F. Supp. 803, a state court's inability to grant relief does not bar a federal court's assuming jurisdiction to inquire

into alleged deprivation of Federal constitutional rights. Problems of relief also controlled in *Radford v. Gary,* 352 U. S. 991, affirming the District Court's refusal to mandamus the Governor to call a session of the legislature, to mandamus the legislature then to apportion, and if they did not comply, to mandamus the State Supreme Court to do so. And *Matthews v. Handley,* 361 U. S. 127, affirmed a refusal to strike down the State's gross income tax statute—urged on the ground that the legislature was malapportioned—that had rested on the adequacy of available State legal remedies for suits involving that tax, including challenges to its constitutionality. Lastly, *Colegrove v. Barrett,* 330 U. S. 804, in which Mr. Justice Rutledge concurred in this Court's refusal to note the appeal from a dismissal for want of equity, is sufficiently explained by his statement in *Cook v. Fortson, supra:* "The discretionary exercise or nonexercise of equitable or declaratory judgment jurisdiction * * * in one case is not precedent in another case where the facts differ.' 329 U. S., at 678, n. 8." Mr. Justice Clark in his concurring opinion also cited the *Kidd* and *Anderson* cases as resting upon adequate state grounds to support the State judgments. It would seem that no member of the Supreme Court, with the possible exception of Mr. Justice Douglas, thought that the *Kidd* case was overruled, or that the ruling in *Baker* precluded the State courts from adopting their own views as to the availability of State remedies.

Since I find nothing in the prior decisions of this Court that would support the exercise of an equitable remedy under the allegations of the bill, I think the chancellor's dismissal of the bill should be affirmed. Judge Horney authorizes me to say that he concurs in the views here expressed.